## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| DR. SCOTT JENSEN,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>MINNESOTA BOARD OF MEDICAL PRACTICE; RUTH MARTINEZ, ELIZABETH A. HUNTLEY, CHERYL L. BAILEY, JOHN M. MANAHAN, PETER J. HENRY, in both their individual and official capacities as members of the Minnesota Board of Medical Practice; BRIAN ANDERSON in his individual and official capacity as a medical regulations analysts for the Minnesota Board of Medical Practice, JANE ROES 1-12, in both their individual and official capacities as members of the Minnesota Board of Medical Practice; and JOHN DOES 1-4, in both their individual and official capacities as members of the Minnesota Board of Medical Practice,<br><br>　　　　Defendants. | Court File No. _____<br><br><br><br><br><br><br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## <u>INTRODUCTION</u>

1.　　Dr. Scott Jensen has been a licensed, practicing physician in good standing in the State of Minnesota for more than 40 years.  To date, he has never been the subject of any investigation brought pursuant to a complaint by any patient he has ever treated in his professional capacity.  In addition to his practice of family medicine, he served the people of Minnesota as a Republican State Senator from District 47 from the years 2017

through 2021.  Dr. Jensen announced in March, 2021 his candidacy for Governor of the State of Minnesota, and won the Republican endorsement for the same in June, 2022.

2.     The Minnesota Board of Medical Practice ("BMP" or "Board") is an executive agency authorized by statute, through its Executive Director and members, to "protect the public from the unprofessional, improper, incompetent, and unlawful *practice of medicine*."  Minn. Stat. § 147.001, subd. 2 (emphasis added).

3.     The Board's investigatory power is limited to those complaints which fall within its jurisdiction and allege violations of the Medical Practice Act.  As with other state regulatory agencies, the Board's authority never extends to First Amendment protected speech.

4.     Between July of 2020 and March of 2023, under the guise of "regulating professional conduct," the Board systematically launched a series of five "investigations" comprised of 18 complaints and one "Conference" into Dr. Jensen's license to practice medicine after he engaged in protected political speech related to COVID-19.

5.     According to the BMP itself, *every* complaint and investigation litigated by the BMP against Dr. Jensen concerned public statements in one form or another, and *none* of the complaints involved patient care or treatment, nor did any involve speech incidental to a medical procedure.  In other words, the Board had no jurisdiction over any of the 18 complaints it received and investigated against Dr. Jensen, with the arguable exception of three.

6.     Dr. Jensen was forced to pursue nearly his entire campaign for Governor of Minnesota under a cloud of constant uncertainty, not knowing which public statements

would be selected by the BMP as tools to chill his speech. Thousands of hours were expended answering the Board's various "requests" to respond to impossibly vague allegations that the Medical Practice Act was violated, which were made under penalty of additional violations against his license for refusal to cooperate.

7. This weaponization of a government agency, which consisted of members who were appointed by Dr. Jensen's opponent in the 2022 election, was all the more egregious because it targeted political speech on matters of great public import – the very type of speech the First Amendment was written to protect.

8. The people of Minnesota were deprived of an open debate in the marketplace of ideas by an ideologically driven, politicized government censorship apparatus which retaliated against its opponent based on the content of the message he espoused. Countless other health care professionals simply refrained from speaking altogether, lest their own career be put in jeopardy by the Board. The true extent of the damage done to the Constitution, enlightened government, and the reputation of Dr. Jensen cannot be understated.

9. In this Complaint, the terms "investigate" and "investigation" are context-dependent. They are used to refer to either collections of Board File Nos. in the five written Complaints by the Board against Dr. Jensen, or the acts of the Board in "requesting" written responses, to appear at a hearing to defend his speech, to produce documents, and the like.

10. "Investigate" is also referred to by the Board as "making inquiries," "gathering information," and "data collect[ion]."

**THE PARTIES**

11.     Plaintiff SCOTT JENSEN ("Dr. Jensen") is a lifelong resident and citizen of Minnesota, currently residing in Chaska, in the District of Minnesota. He received his license to practice medicine in 1982, and his license has remained active since its issue date including at all times relevant in the instant case.  Before July 2020, he had never received a complaint or had been investigated by the Minnesota Board of Medical Practice or its Complaint Review Committee.

12.     From 2017 through 2021, Dr. Jensen served a four-year term as Minnesota State Senator. Dr. Jensen was vice-chair of the Senate Health and Human Services Committee during the entirety of his term.  As such, he was the chief senate author of two major health-care policy bills, and he developed a reputation for questioning the official narrative surrounding COVID-19 particularly as it applied to executive branch government reaction thereto.

13.     Defendant MINNESOTA BOARD OF MEDICAL PRACTICE ("BMP," the "Board") is an executive branch agency for the State of Minnesota.  Its address is 335 Randolph Ave., St. Paul, Minnesota 55102.  It also oversees and is responsible for the Complaint Review Committee, to which it has assigned the duty of determining whether to dismiss or investigate complaints within its jurisdiction against licensees.  If the decision is made to investigate a complaint, it is also responsible for carrying out the investigation and for ultimately meting out various punishments within its authority under state statutes.

14.     Defendant RUTH MARTINEZ was the Executive Director of the Board from at least February 21, 2018 until February 5, 2023 and a member thereof since 1988.

4

Either she or her designated board member is directly charged with making the decision whether a complaint falls within the authority of the Board to investigate.  Upon receipt of a complaint: "The executive director or the designated board member shall determine whether the complaint alleges or implies a violation of a statute or rule which the board is empowered to enforce."  Minn. Stat. §214.103 Subd. 2. Upon information and belief, Defendant Martinez determined whether the Board had jurisdiction over Dr. Jensen's speech for one or more of the Complaints against Dr. Jensen's license described herein.

15.    Defendant ELIZABETH A. HUNTLEY is the current Executive Director of the Board and has been since February 6, 2023.  She has also been a member thereof since at least 2004.  Either she or her designated board member is directly charged with making the decision whether a complaint falls within the authority of the Board to investigate. Upon information and belief, Defendant Huntley determined whether the Board had jurisdiction over Dr. Jensen's speech for one or more of the Complaints against Dr. Jensen's license described herein.

16.    Defendant BRIAN ANDERSON is a Medical Regulations Analyst who works for the BMP.  He wrote each letter initiating investigations into Dr. Jensen's speech, which included "requesting" information, production of documents, and attendance at a conference.

17.    Defendant CHERYL L. BAILEY is and has been a member of the Board since September 19, 2018.  She is the Vice President of the Board and the Chair of the Complaint Review Committee ("CRC" or "Committee").  As such, Defendant Bailey oversaw and participated in some or all of the investigations into Dr. Jensen's speech, and

5

was responsible for conducting and participating in the Conference held on March 24, 2023. Upon information and belief, Defendant BAILEY was a "designated board member" who made the determination(s) as to jurisdiction over Dr. Jensen's speech within the meaning of Minn. Stat. §214.103 Subd. 2 for one or more of the Complaints against Dr. Jensen's license described herein. She is also responsible for refusing to dismiss at least six complaints against Dr. Jensen for lack of jurisdiction.

18.     Defendant JOHN M. MANAHAN is the President of the Board and has been a member thereof since at least September 19, 2018. He was a member of the Committee when he participated in one or more of the investigations into Dr. Jensen's speech, and participated in the Conference held on March 24, 2023. Upon information and belief, Defendant MANAHAN was a "designated board member" who made the determination(s) as to jurisdiction over Dr. Jensen's speech within the meaning of Minn. Stat. §214.103 Subd. 2 for one or more of the Complaints against Dr. Jensen's license described herein. He is also responsible for refusing to dismiss at least six complaints against Dr. Jensen for lack of jurisdiction.

19.     Defendant PETER J. HENRY is and has been a member of the Board since at least June 22, 2022. He was a member of the Committee when he participated in one or more of the investigations into Dr. Jensen's speech, and participated in the Conference held on March 24, 2023. Upon information and belief, Defendant HENRY was a "designated board member" who made the determination as to jurisdiction over Dr. Jensen's speech within the meaning of Minn. Stat. §214.103 Subd. 2 for one or more of the Complaints

against Dr. Jensen's license described herein.  He is also responsible for refusing to dismiss at least six complaints against Dr. Jensen for lack of jurisdiction.

20.     Defendants JANE ROE 1-12 were Board members for at least a portion of the period between January 1, 2020 and the March 24, 2023 Conference.  Upon information and belief, they were "designated board members" who were individually responsible for making the determination that jurisdiction over Dr. Jensen's speech was proper within the meaning of Minn. Stat. §214.103 Subd. 2 for one or more of the Complaints against Dr. Jensen's license described herein.

21.     Defendants JOHN DOE 1-4 were Board members for at least a portion of the period between January, 2020 and the March 24, 2023 Conference.  Upon information and belief, they were "designated board members" who were individually responsible for making the determination that jurisdiction over Dr. Jensen's speech was proper within the meaning of Minn. Stat. §214.103 Subd. 2 for one or more of the Complaints against Dr. Jensen's license described herein.

## JURISDICTION AND VENUE

22.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because the claims arise under the Constitution and laws of the United States.

23.     This Court has authority to award the requested relief pursuant to 28 U.S.C. §§ 2201 and 2202; and costs and attorneys' fees pursuant to 42 U.S.C. §§ 1983 and 1988(b).

24.     This Court has both general and specific jurisdiction over the Defendants pursuant to 28 U.S.C. § 1391(c)(1) and (c)(2) because all Defendants reside within the District of Minnesota and their acts alleged herein took place in the District of Minnesota.

25.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2) because all Defendants reside in this judicial District and a substantial part of the events or omissions giving rise to the claims occurred in this judicial District.

## FACTUAL ALLEGATIONS

### The Legal Standard for Regulation of Professional Speech

26.     "The First Amendment reflects 'a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.'" *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) (quoting *New York Times v. Sullivan*, 376 U.S. 254, 270 (1964)).  "The right of citizens to inquire, to hear, to speak, and to use information to reach consensus is a precondition to enlightened self-government and a necessary means to protect it."  *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 339 (2010).

27.     "Because First Amendment freedoms need breathing space to survive, a state may regulate in the area only with narrow specificity."  *Gooding v. Wilson*, 405 U.S. 518, 522 (1972).

28.     The United States Supreme Court "has not recognized 'professional speech' as a separate category of speech" that is exempted "'from the normal prohibition on content-based restrictions.'" *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct.

2361, 2371-72 (2018) ("*NIFLA*") (quoting *United States v. Alvarez*, 567 U. S. 709, 722 (2012) (plurality opinion)).

29.     However, "States may regulate professional *conduct*, even though that conduct incidentally involves speech." *Id*. at 2372 (emphasis added).

30.     Speech that is incidental to professional conduct occurs "'as part of the *practice* of medicine, [which is] subject to reasonable licensing and regulation by the State.'" *Id*. at 2373 (quoting *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U. S. 833, 884 (1992) (joint opinion of O'Connor, Kennedy, and Souter, JJ.) (emphasis in *NIFLA*).

31.     More specifically, the *NIFLA* Court implicitly identified the "*practice* of medicine" with the offer or performance of a "medical procedure," for which, for example, the State might legitimately regulate a professional's procurement of "informed consent." *Id*.

32.     Therefore, the State may only regulate the speech of medical professionals when the speech is incidental to the conduct of the medical profession that is subject to State regulation—that is, when the speech is incidental to the offer or performance of a medical procedure.

33.     Outside of this narrow context, the Supreme Court "has stressed the danger of content-based regulations 'in the fields of medicine and public health, where information can save lives.'" *Id*. at 2374 (quoting *Sorrell v. IMS Health Inc*., 564 U.S. 552, 566 (2011)).

34.     A medical professional's speech outside the narrow context of a medical procedure is speech that receives the full protection of the First Amendment. *Id*. at 2374

35.     A regulation is unconstitutionally overbroad when "a substantial number of instances exist in which the law cannot be applied constitutionally." *Speet v. Schuette*, 726 F.3d. 867, 872 (6th Cir. 2013).

36.     When a State regulates speech on the basis of content, its regulation receives strict scrutiny by the court. *Id*. at 2374.

## The Role and Authority of the BMP

37.     The BMP "consists of 16 residents of the state of Minnesota appointed by the governor." Minn. Stat. § 147.01, subd. 1.  These are 10 licensed M.D. physicians, 1 licensed Doctor of Osteopathy, and 5 public members, each appointed to 4-year terms.  *Id.*

38.     "The primary responsibility and obligation of the Board of Medical Practice is to protect the public," including "from the unprofessional, improper, incompetent, and unlawful practice of medicine." Minn. Stat. § 147.001, subd. 2.

39.     To this end, the Board has the responsibility of issuing licenses to practice medicine as well as "receiving and investigating complaints, reviewing misconduct cases, and imposing disciplinary actions." Minn. Stat. 147.02, subds. 1 and 5.

40.     Under Minn. Stat. § 147.161, subd. 1, "[e]ach complaint filed with the board pursuant to section 214.10, subdivision 1, shall be investigated according to section 214.10, subdivision 2."

41.     However, section 214.10, subdivision 2 only "empower[s]" the Board to investigate "a violation of statute or rule" if such violation is one "which the Board is to

enforce." In other words, if there is no jurisdiction over the complaint on its face, neither the Board nor any other person is "empowered to investigate" the complaint further.

42.     Additionally, Minn. Stat. § 214.103 more specifically governs the process for health-related licensing boards, of which the BMP is one, Minn. Stat. § 214.01, subd. 2, to review and investigate complaints.

43.     Minnesota Statute § 214.103 lays out the complaint review, investigation, and resolution process which was used by the Board against Dr. Jensen in each of the five Complaints against his license.  This statute also provides the framework for  the Conference held by the Board as an "attempt at resolution" of the unlawfully investigated Complaints.

44.     Significantly, this process is not compliant with the Administrative Procedure Act and therefore lacks the due process protections therein.

45.     Before investigating a Complaint against a licensee:

The executive director or the designated board member shall determine whether the complaint alleges or implies a violation of a statute or rule which the board is empowered to enforce.  The executive director or the designated board member may consult with the designee of the attorney general as to a board's jurisdiction over a complaint.

Minn. Stat. §214.103 Subd. 2.

46.     The Board's investigative authority in Minn. Stat. § 214.103 is further restrained by the Supreme Court's holding in *NIFLA*, which limits the State's regulation of professional speech to speech incidental to the offer or performance of a medical procedure.

11

47.     Along the same lines, Minn. Stat. § 214.103 Subd. 1a(b)(4) requires the Board to "…notify the licensee that the board has received a complaint and inform the licensee of *whether* an investigation is being conducted."  (emphasis added).  This demonstrates that an investigation only comes at the discretion of the Board, and only after a finding that it had jurisdiction over the complaint in the first place.

48.     The BMP's obligation to investigate each complaint filed with it is limited to those complaints which regard conduct within the BMP's statutory and constitutional authority to address, and the BMP need not use its investigatory powers simply because it receives a complaint against a medical doctor like Dr. Jensen.

49.     If Minn. Stat. § 214.103 were interpreted to allow any person to force an investigation of any doctor in Minnesota based on a complaint about that doctor's speech, it would render section 214.103 unconstitutional under the First Amendment to the United States Constitution and Article I, section 3 of the Minnesota Constitution.

50.     Whether the statute specifically governing the complaint and investigation process is section 214.10 or 214.103, both statutes require that the Board have jurisdiction before proceeding to "investigate" a complaint. The only option the Board has, when faced with a complaint which alleges that *political speech* violates the statutes or rules it enforces, is dismissal.

**The "Attempts at Resolution" Process in Minn. Stat. §214.103 Subd. 6**

12

51.     The Board frames the entirety of each of the investigative processes carried out against Dr. Jensen as "attempts at resolution" under Minn. Stat. §214.103 Subd. 6.  This statute provides, in relevant part:

> At any time after receipt of a complaint, the executive director or the designated board member may attempt to resolve the complaint with the regulated person. The available means for resolution include a conference or any other written or oral communication with the regulated person. A conference may be held for the purposes of investigation, negotiation, education, or conciliation. Neither the executive director nor any member of a board's staff shall be a voting member in any attempts at resolutions which may result in disciplinary or corrective action. The results of attempts at resolution with the regulated person may include a recommendation to the board for disciplinary action, an agreement between the executive director or the designated board member and the regulated person for corrective action, or the dismissal of a complaint. If attempts at resolution are not in the public interest, a contested case hearing may be initiated.

52.     The authority to confer with a regulated person in subdivision 6 is limited to those complaints which have not been necessarily dismissed for lack of jurisdiction under the process stated in subdivision 2 of section 214.103.

53.     So, in addition to the potential for adverse action against his license, the nearly three-year process was the punishment for Dr. Jensen, as well as the threat of additional violations for failure to comply with the unlawful investigations.

## The Role of Social Media in BMP Investigations

54.     In public statements in early February, 2018, Executive Director Ruth Martinez addressed an audience of Bloomington residents to discuss the role and authority of the BMP.  She explained to the room that she had joined the Board of Medical Practice in 1988, some 30 years earlier.  Martinez, Ruth.  "Minnesota Board of Medical Practice."

Bloomington, MN Noon Rotary, 2 February 2018, https://www.youtube.com/watch?v=I-0h3CAXoQM&t=236s (last accessed May 17, 2023) (hereinafter "Martinez Comments").

55.    Executive Director Martinez explained the role of social media in BMP investigations thusly:

> Social Media for us as a Board is not something that we rely upon in our investigative process.  There may be comments, there may be information on a social media site… and we also have very strict limitations on how we may use information that comes from social media.  So we are aware, but it is not what we rely upon to really establish our fact-finding if we're in a place where we're going to take action.

> *Id*. at 27:55

56.    Therefore, it was the policy of the BMP until at least February, 2018 *not* to rely on social media posts in the investigative fact-finding process under section 214.103 Subd. 6.

### The Role and Authority of the Minnesota Attorney General in Investigation of Complaints on Behalf of the BMP

57.    The legislature recognized the importance of the determination of jurisdiction over a physician's professional conduct versus his speech.  That is why it specifically vested the Executive Director or designated Board member with the authority to consult with the Attorney General's Office in making this decision.

58.    Upon receiving a forwarded complaint or communication from the Board, "[t]he designee of the attorney general providing legal services to a board shall evaluate [it]," and "[i]f the communication alleges a violation of statute or rule which the board is

to enforce, the designee is empowered to investigate the facts alleged in the communication." Minn. Stat. 214.10, subd. 2.

59.     Minnesota Statute 214.103, subd. 2 pertains to Health-Related Licensing Boards in particular and is complementary to Minn. Stat. 214.10, subd. 2. It provides: "The executive director or the designated board member may consult with the designee of the attorney general as to a board's jurisdiction over a complaint."

60.     Thus, Defendant Ruth Martinez or her designated board member was required to make the determination whether a received complaint is within the jurisdiction of the Board and is specifically empowered to consult the OAG's designee in making this decision.

61.     In her February, 2018 public comments, Director Martinez explained that "The Attorney General's Office participates in all of our complaint and investigative proceedings. They handle litigation for us, conduct hearing processes, give us a lot of legal guidance throughout all of the work that we do." *Martinez Comments* at 8:42.

62.     Further, "The bulk of the work at the Board is around complaint and investigative processing. We issue a lot of licenses but we process somewhere in the neighborhood of 800 complaints annually, so that's a very significant part of the Board's work." *Id.*

63.     These statements demonstrate that Director Martinez had extensive experience working with the OAG in processing complaints and investigations against licensees, including consulting the OAG on legal questions such as jurisdiction over professional conduct.

64.     Again, the OAG's *obligation* to investigate complaints forwarded to it by the BMP is limited to those complaints which regard conduct within the BMP's authority to address.

**COVID-19 and Dr. Jensen's Public Speech**

65.     In March 2020, President Donald Trump declared the COVID-19 pandemic a national emergency.

66.     As one of only two practicing physicians in the Minnesota Senate at the time, Dr. Jensen played an instrumental role on the Health and Human Services Committee in creating government policies to address the pandemic across the State.  In his own words, Dr. Jensen was "both critical and complimentary of various actions by the Center for Disease Control (CDC), the Minnesota Department of Health, and the State of Minnesota."

67.     On March 30, 2020, Dr. Jensen wrote an open letter to Minnesota Governor Tim Walz and state Department of Health Commissioner Jan Malcolm, questioning the decision to forcibly close much of the Minnesota economy in response to the pandemic. Callaghan, Peter.  "Timeline: COVID sparked Jensen's run for Governor and remains recurring      theme."      *MinnPost*,      13      September      2022, https://www.minnpost.com/elections/2022/09/timeline-covid-sparked-jensens-run-for-governor-and-remains-recurring-theme/ (last accessed May 15, 2023).

68.     Days later, on April 3, 2020, the Minnesota Department of Health issued an advisory to Minnesota "colleagues involved with death registration and certification."  See Minnesota Department of Health, 3 April 2020.  "OVR Operations and COVID-19 Death

Certificate Information [mass email].  The missive described a change in the way COVID-related deaths are to be recorded.  Specifically, it advised those who certify deaths in Minnesota to "Report Coronavirus Disease 2019 or COVID-19 on death certificates for all decedents where the disease caused, *is assumed to have caused, or contributed,* to death." *Id.*

69.     On April 8, 2020, Dr. Jensen publicly and vocally highlighted the inconsistency between this new advisory by the Minnesota Executive branch, and the then-current CDC guidance on COVID-19 death certificates regarding the difference between the *cause* of death and a *contributing factor* thereto.  "The Ingraham Angle," FOX News, 8       April,       2020,       available       at: https://archive.org/details/FOXNEWSW_20200409_020000_The_Ingraham_Angle,  last visited May 15, 2023.

70.     Within days of this television appearance, the BMP received its first complaints related to Dr. Jensen's public speech.  No action was taken by the BMP until after the Minnesota Legislature adjourned in May.

**The BMP Investigates Dr. Jensen for His Protected Speech for the First Time**

71.     On June 22, 2020, the BMP addressed a letter to Dr. Jensen ("Complaint One") that was signed by Brian Anderson ("Anderson"), Medical Regulations Analyst.

72.     The subject line to Complaint One read "RE: Complaints regarding COVID-19 *public statements*" and cited to "Board Files Nos: BFA05200976, BFA05200977." (emphasis added).

17

73.    Complaint One stated that the BMP "has received complaints regarding public statements you made related to COVID-19."

74.    Complaint One stated that, "[i]n accordance with Minnesota law, the Board is required to make inquiries into all complaints and reports wherein violations of the Medical Practice Act are alleged, including but not limited to Minn. Stat. § 147.091, subd. 1(g)."

75.    Minn. Stat. § 147.091, subd. 1(g) addresses "any unethical or improper conduct, including but not limited to:

> (1) conduct likely to deceive or defraud the public;
> (2) conduct likely to harm the public;
> (3) conduct that demonstrates a willful or careless disregard for the health, welfare, or safety of a patient;
> (4) medical practice that is professionally incompetent; and
> (5) conduct that may create unnecessary danger to any patient's life, health, or safety, in any of which cases, proof of actual injury need not be established."

76.    Complaint One "requested" that Dr. Jensen "respond, in writing, to the following complaint summary/allegations:"

> a. "It is alleged that you were 'spreading misinformation [regarding COVID-19] on a regional tv station [i.e. KXJB-TV],' claiming that the Minnesota Department of Health instructed providers to list COVID-19 as the cause of death on death certificates regardless of whether a patient died of COVID-19;" (brackets in original); and
> b. "It is alleged that you also provided 'reckless advice [regarding COVID-19] over *social media*,' stating that COVID-19 'is nothing more than the flu.'" (brackets in original) (emphasis added).

77.    The term "misinformation" is not defined in the Medical Practice Act, or anywhere else in Minnesota Statutes.

78.     The use of social media posts as a basis for investigation represents a stark departure from Executive Director Martinez's stated Board policy.  Thus, the Board and the CRC applied different standards to Dr. Jensen based on the content of his speech.

79.     None of these allegations were made by patients of Dr. Jensen.

80.     None of these allegations concern patient-care complaints or the offer or performance of a medical procedure, and therefore do not involve the practice of medicine subject to regulation.

81.     All of these allegations concern public statements made by Dr. Jensen.

82.     All of these allegations concern speech protected by the First Amendment.

83.     None of these allegations allege professional conduct that the Board is empowered to regulate under the standard for professional speech provided in *NIFLA*.

84.     The Board was not required by law to investigate Dr. Jensen's speech.

85.     In fact, the Board's investigation of allegations against Dr. Jensen for violation of Minn. Stat. § 147.091, subd. 1(g) may not extend to speech on matters of public concern unrelated to the offer or performance of a medical procedure.

86.     The Board's investigation of the allegations against Dr. Jensen under Minn. Stat. § 214.103 for violation of Minn. Stat. § 147.091, subd. 1(g) is unconstitutional, facially and as-applied, because Section 147.091 Subd. 1(g) inherently targets speech, and the investigation did in fact target Dr. Jensen's speech.

87.     Complaint One further requested that "[w]ith your response, please include any relevant documentation you have received from the Minnesota Department of Health

regarding COVID-19, and any other materials that you would like the Board to consider in its review of the matter."

88.    Complaint One informed Dr. Jensen that:

Once all of the information has been gathered, the complaints will be reviewed by the Board's Complaint Review Committee. This Committee is made up of three members of the Board, including two physicians and one public member. The Complaint Review Committee may decide to dismiss the complaints, request further information, or request that you appear to discuss the matter in person.

*See* **Exhibit 1**, attached hereto.

89.    Finally, Complaint One warned that "as a licensee of the Board, you are required to cooperate fully with the investigation into this matter. Failure to cooperate could result in disciplinary action by the Board."

90.    On July 2, 2020, Dr. Jensen responded to the BMP's Complaint One ("Response One").

91.    His sixty-plus page Response One consisted of a lengthy typewritten narrative and fourteen attachments.  Put in the impossible position to "justify" his speech, Dr. Jensen attempted to fully cooperate and comply with the Board's illegal demands and reveal the rationale informing the perspective of his public statements.

92.    As part of his response, Dr. Jensen expressed his concern that the investigation was plainly targeting his speech through public statements, and that the process seemed to be politically motivated.  He expressed similar frustrations in a July Star Tribune article. *See* Klecker, Mara.  "State Sen. Scott Jensen says he's being investigated by the state medical board for COVID-19 comments."  *Star Tribune*, 6 July, 2020,

https://www.startribune.com/gop-legislator-under-scrutiny-over-covid-19-comments/571637602/?refresh=true (last accessed May 15, 2023).

93.     On July 27, 2020, the BMP addressed a dismissal notice to Dr. Jensen ("Dismissal Notice One"), signed by Mr. Anderson.

94.     Dismissal Notice One concerned the same subject as Complaint One.

95.     Dismissal Notice One stated that the BMP "has conducted an investigation of two complaints that were filed against you in relation to public statements you made regarding COVID-19."

96.     Dismissal Notice One went on to state that, "[a]fter a thorough review of both the Medical Practice Act and the facts of the situation, including those that you have provided, the Board has decided to dismiss the complaints and close its investigation at this time."

97.     The unlawful actions taken against Dr. Jensen by the Board had already by this point caught the attention of prominent national and state officials. This included Minnesota Senate Majority Leader Paul Gazelka, who said he was "exploring whether or not the Board is compelled to investigate every complaint, or if they are choosing to investigate Dr. Jensen." *Quoted in* Berry, Susan.  "Minnesota Sen. Dr. Scott Jensen Under Investigation After Criticism of CDC Classification of Virus Deaths."  *Breitbart* 21 July 2020,     https://www.breitbart.com/politics/2020/07/21/minnesota-sen-dr-scott-jensen-under-investigation-after-criticism-cdc-classification-virus-deaths/ (last accessed May 17, 2023).

98.     Majority Leader Gazelka, who would vie for the Republican gubernatorial endorsement against Dr. Jensen, went on to say that "[l]egislators should not have to fear regulators based on their speech. If the bureaucratic state can silence speech through investigations, we have very dark times ahead for our democracy."  *Id.*

**The BMP Investigates Dr. Jensen for His Protected Speech for the Second Time**

99.     Barely a month after the dismissal of Complaint One, the BMP addressed a second letter to Dr. Jensen ("Complaint Two") that was signed by Mr. Anderson on September 1, 2020.  The subject line to Complaint Two read "RE: Notice of Complaint Regarding COVID-19" and cited to "Board File No: BFA07200078."

100.    Complaint Two stated that "the Board has received a complaint alleging that you '[continue] to mislead' and 'lie' to the public about COVID-19." (brackets in original).

101.    Complaint Two stated that, "[p]ursuant to Minn. Stat. § 214.103, the Board is required to notify licensees regarding all complaints and reports wherein violations of the Medical Practice Act are alleged, including but not limited to Minn. Stat. § 147.091, subd. 1(g) and (k)."

102.    Complaint Two contained the following allegations:

   a.  "On July 20 and 21, 2020, you posted Facebook videos that contain false and misleading information and conclusions;"
   b.  "You falsely compare and minimize the difference between the 2009 H1N1 pandemic and COVID-19;" and
   c.  "You are a 'danger to public health.'"

*See* **Exhibit 2**, attached hereto.

103.    The use of social media posts as a basis for investigation represents a stark departure from Executive Director Martinez's stated Board policy.   Thus, different standards were applied to Dr. Jensen based on the content of his speech, and the investigation was conducted in retaliation for these "false and misleading information and conclusions."

104.    None of these allegations were made by patients of Dr. Jensen.

105.    None of these allegations concern patient-care complaints or the offer or performance of a medical procedure.

106.    All of these allegations concern public statements made by Dr. Jensen.

107.    All of these allegations concern speech protected by the First Amendment.

108.    None of these allegations allege conduct that the Board is empowered to enforce under the standard for professional speech provided in *NIFLA*.

109.    The Board was not required by law to investigate Dr. Jensen's speech.

110.    If the Board were required by law to investigate Dr. Jensen's speech, the statute requiring that investigation would be facially unconstitutional.

111.    In fact, the Board's investigation of allegations against Dr. Jensen under Minn. Stat. § 214.103 may not extend to speech on matters of public concern unrelated to the offer or performance of a medical procedure.

112.    The Board's investigation of the allegations against Dr. Jensen under Minn. Stat. § 214.103 for violation of Minn. Stat. § 147.091, subd. 1(g) is unconstitutional, facially and as-applied, because Section 147.091 Subd. 1(g) inherently targets speech, and the investigation did in fact target Dr. Jensen's speech.

113.    Minn. Stat. § 147.091, subd. 1(k), addresses "[c]onduct that departs from or fails to conform to the minimal standards of acceptable and prevailing medical practice in which case proof of actual injury need not be established."

114.    The allegations in Complaint Two relate only to protected speech, not conduct, and so the Board had no authority or jurisdiction to investigate them.

115.    The Board's investigation of the allegations against Dr. Jensen under Minn. Stat. § 147.091, subd. 1(k) is unconstitutional as-applied because the investigation used the pretext of investigating conduct under Minn. Stat. § 214.103 Subd. 6 to target Dr. Jensen's speech.

116.    Complaint Two stated that, "[i]f [he] would like," Dr. Jensen had until September 21, 2020, "to submit a written response regarding the above-referenced allegations and any supporting materials."

117.    Finally, as with Complaint One, Complaint Two included the threat that "as a licensee of the Board, you are required to cooperate fully with the investigation into this matter. Failure to cooperate could result in disciplinary action by the Board."

118.    Dr. Jensen responded to the BMP's Complaint Two ("Response Two"), again expressing his concern that the process had become politicized to punish him for his public speech.

119.    Nevertheless, Dr. Jensen attempted to comply with the Board's illegal demands in his Response Two to Complaint Two on September 7, 2020, again including a narrative response, scholarly data, and medical literature.  In his Response Two, he notified the Board that he believed:

24

…these current allegations do blur the border between an appropriate concern forwarded to the MN Board of Medical Practice and a vicious, mean-spirited effort to silence a viewpoint not supported by an accuser who hides behind a veil of protected anonymity. ... The allegations you are now investigating are remarkably ambiguous and reveal the qualities of a personal attack. I believe your organization and mission is being abused by those who seek to silence words, ideas, and perspectives in conflict with their own.

120.    Also in his Response Two, an exasperated Dr. Jensen noted that:

    a.  "The allegations are nebulous and broad."

    b.  "There is no identification of what is supposedly false and misleading."

    c.  "There is no identification of what represents a minimization of differences between the 2009 H1N1 and COVID-19 pandemics."

    d.  "There is no identification of any facts supporting the inflammatory denunciation of being a 'danger to public health.'"

    e.  "Thus, there is no way I can know how to respond."

121.    Dr. Jensen emailed Mr. Anderson on Wednesday, October 21, 2020, stating, "it has been six weeks since I responded to the MN Board of Medical Practice investigation regarding complaint # BFA0720078. Is there anything else you need from me?"

122.    In his email to Mr. Anderson, Dr. Jensen also stated, "I am compelled to share with you that this anonymous complaint accusing me of being a 'danger to public health' has an ongoing chilling and suppressing effect on my ability to candidly and honestly share my perspective and thoughts with patients and constituents."

123.    That same day, Mr. Anderson responded via email to say that "[t]he Board's Complaint Review Committee's monthly meeting is scheduled for tomorrow, during which your case will be reviewed. I anticipate that you will receive formal notice of the Committee's decision in the mail by the end of next week. No additional information is needed at this time."

124.   On October 28, 2020, Mr. Anderson emailed Dr. Jensen to say that "[t]he Board's Complaint Review Committee dismissed the complaint on October 22, 2020. A hard copy of the attached dismissal notice has also been placed in the mail."  The BMP addressed a letter to Dr. Jensen ("Dismissal Notice Two") that same day, signed by Mr. Anderson.

125.   Dismissal Notice Two concerned the same subject as Complaint Two, and included the statement that the BMP "has conducted an investigation of a complaint regarding your public statements about COVID-19."

126.   Dismissal Notice Two went on to state that, "[a]fter a thorough review of both the Medical Practice Act and the facts of the situation, including those that you have provided, the Board has decided to dismiss the complaints and close its investigation at this time."

127.   By the Fall of 2020, having already announced that he would not stand for reelection to the state senate that year, Dr. Jensen contemplated his political future.  He had gained through his public statements a reputation as someone who was unafraid to challenge the official health care narrative, which had plainly earned him the ire of his political opponents.

128.   After nearly a year of deliberation, and after the second BMP investigation into his speech had finally concluded, Dr. Jensen formally announced on March 16, 2021 that he would be running for Minnesota Governor.  If he were to run and lose, he reasoned, he would still keep his medical license and continue his passion for patient care and the practice of medicine.

**The BMP Investigates Dr. Jensen for His Protected Speech for the Third Time**

129.   Two weeks later, on April 1, 2021, the BMP addressed a third letter to Dr. Jensen ("Complaint Three") that was signed by Mr. Anderson.

130.   The subject line to Complaint Three read "RE: Notice of Board Complaint" and cited to "Board File No: BFA01210500."

131.   Complaint Three stated that, "[a]ccording to Minnesota law, the Board is required to notify all licensees of complaints and reports wherein violations of the Medical Practice Act are alleged, including but not limited to Minn. Stat. § 147.091, subd. 1(g) and (k)."

132.   These are the same sections of the Medical Practice Act alleged to have been violated in the previous Complaints, except that Complaint One did not allege a violation of Minn. Stat. § 147.091, subd. 1(k).

133.   Complaint Three stated it was a "notice that, in January 2021, the Board received a complaint alleging that you are 'very publicly minimizing and [sic] 'deliberately downplaying' COVID-19 deaths. The complaint included several social media posts purportedly made from your Twitter account since October 2020."

134.   The use of social media posts as a basis for investigation represents a stark departure from Executive Director Martinez's stated Board policy.  Thus, the Board and the CRC applied different standards to Dr. Jensen based on the content of his speech.

135.   This allegation was not made by a patient of Dr. Jensen.

136.   This allegation does not concern patient-care complaints or the offer or performance of a medical procedure.

137.   This allegation concerns public statements made by Dr. Jensen.

138.   This allegation concerns speech protected by the First Amendment.

139.   This allegation does not allege conduct that the Board is empowered to enforce under the standard for professional speech provided in *NIFLA*.

140.   The Board was not required by law to investigate Dr. Jensen's speech.

141.   If the Board were required by law to investigate Dr. Jensen's speech, the statute requiring that investigation would be facially unconstitutional.

142.   Complaint Three went on to state that "[t]he complaint was reviewed by the Board's Complaint Review Committee on March 25, 2021. After a thorough review of both the Medical Practice Act and the facts of the situation, the Board has decided to dismiss the complaint. The matter is now closed."

143.   Finally, Complaint Three stated that "this complaint is not public; however, it will remain on file."  This was also intended to chill Dr. Jensen's speech.

144.   This was the only communication Dr. Jensen received regarding the investigation of the allegation involved in Complaint Three and, unlike the others, the BMP did not "request" a response under threat of further violations.

145.   The Board's decision not to investigate Complaint Three and dismiss it without investigation demonstrates that the investigations into Complaints One and Two were discretionary and were intended to chill Dr. Jensen's speech.

146.    Throughout the Spring and Summer of 2021, Dr. Jensen continued to speak his perspective about the government response to COVID-19 and speak as an independent voice who questioned the dominant political narrative in the State of Minnesota and nationwide.

147.    Along these lines, Dr. Jensen has written affidavits connected to lawsuits across several states, providing his opinion on COVID-19 policies regarding subjects such as mask mandates for children and adults without exemptions, and business and church closures.  His public comments and opinions in this area led to his participation in a lawsuit filed in U.S. District Court in the Northern District of Alabama.

148.    *America's Frontline Doctors, et al. v. Becerra, et al.* was filed on May 19, 2021 and assigned Case Number 2:2021cv00702.  Dr. Jensen submitted an affidavit in support of the plaintiffs, testifying to his experiences as a practicing family physician for 40 years.  He was initially a named plaintiff in the suit, but contacted attorneys representing the plaintiffs in that case in June to have his name removed as it was never his intention to participate as such.

**The BMP Investigates Dr. Jensen for His Protected Speech for the Fourth Time**

149.    On August 3, 2021, the BMP addressed a fourth letter to Dr. Jensen ("Complaint Four") that was signed by Mr. Anderson.

150.    The subject line to Complaint Four read "RE: Complaint Regarding Petition for Temporary Restraining Order Filed in U.S. District Court" and cited to "Board File No: BFA06210913."

29

151.   The Second Circuit has instructed that "the right to petition government for redress of grievances--in both judicial and administrative forums--is 'among the most precious of the liberties safeguarded by the Bill of Rights.'" *Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996) (quoting *United Mine Workers v. Illinois State Bar Ass'n*, 389 U.S. 217, 222, 19 L. Ed. 2d 426, 88 S. Ct. 353 (1967)); *cited in Piscottano v. Town of Somers*, 396 F. Supp. 2d 187, 206 (D. Conn. 2005).

152.   Complaint Four stated that the BMP "has received a complaint regarding a petition for temporary restraining order ("TRO") filed by you, America's Frontline Doctors, and other plaintiffs in the U.S. District Court for the Northern District of Alabama on May 20, 2021. The TRO was reportedly filed against the emergency use authorization permitting the use of COVID-19 vaccines in children under the age of 16."

153.   Complaint Four further stated that:

[a]ccording to the complaint, the TRO falsely claimed that children under the age of 16 'are at 0% risk of death, and that [children] are not at risk of harm from COVID-19.' The complaint further alleged that your 'attempt to use the legal system to not allow any children in the U.S. to receive this vaccination during the pandemic...is a gross breach of professional conduct and will lead to measurable harm.'

*See* **Exhibit 4**, attached hereto.

154.   This allegation was not made by a patient of Dr. Jensen.

155.   This allegation does not concern patient-care complaints or the offer or performance of a medical procedure.

156.   This allegation concerns speech that is protected by the First Amendment, specifically the right "to petition the Government for a redress of grievances." U.S. Const. amend. I.

157.   Director Martinez, her designated board member, and/or the CRC alleged violation of the Medical Practice Act by Dr. Jensen based on the *content* of the Complaint in the Alabama court case--the "false claims" of the TRO--which was prepared by attorneys on behalf of many named plaintiffs.

158.   The Board and the CRC then compelled Dr. Jensen to respond to the illegal investigation under penalty of additional violations for refusal to cooperate.

159.   This allegation does not allege conduct that the Board is empowered to enforce under the standard for professional speech provided in *NIFLA*.

160.   The Board was not required by law to investigate Dr. Jensen's speech.

161.   If the Board were required by law to investigate Dr. Jensen's speech, the statute requiring that investigation would be facially unconstitutional.

162.   In fact, the Board's investigation of allegations against Dr. Jensen under Minn. Stat. § 147.091, subd. 1(g) may not extend to speech on matters of public concern unrelated to the offer or performance of a medical procedure.

163.   The Board's investigation of the allegations against Dr. Jensen for violation of Minn. Stat. § 147.091, subd. 1(g) is unconstitutional, both facially and as-applied, because the statute inherently targets speech, and the investigation did in fact target Dr. Jensen's speech.

164.   The allegations in Complaint Four relate only to protected speech, not conduct, and so the Board had no authority or jurisdiction to investigate them.

165.   Complaint Four stated that "[a]ccording to Minnesota law, the Board is required to make inquiries into all complaints and reports wherein violations of the Medical Practice Act are alleged, including but not limited to Minn. Stat. § 147.091, subd. 1(g)."

166.   Complaint Four "requested" that Dr. Jensen "respond to the Board, in writing, with the following information by August 27, 2021:"

    a.   "A description of your current practice situation;"
    b.   "The current status of the TRO and/or the U.S. District Court's ruling on the matter; and"
    c.   "Any additional information that you would like the Board to consider in its review of this matter."

      *See* **Exhibit 4**.

167.   Complaint Four further requested that "[w]ith your response, please include a copy of the TRO and any relevant decisions filed by the U.S. District Court."

168.   Finally, as with Complaint One and Two, Complaint Four carried with it the warning that "as a licensee of the Board, you are required to cooperate fully with the investigation into this matter. Failure to cooperate could result in disciplinary action by the Board."

169.   On August 17, 2021, Dr. Jensen responded to the BMP's Complaint Four ("Response Three").

170.   In his dense, 62-page Response Three, Dr. Jensen provided a typewritten statement, toxicology reports, and medical journals, in an effort to "justify" the perspective he expressed in the lawsuit's affidavit to the BMP.

171.    Dr. Jensen again made national news in September, 2021 when he publicly voiced his opinion on a social media video challenging a newly-announced Executive Order which would compel 100 million Americans to take a COVID-19 injection:  "I'm calling on all citizens to stand up — especially I am calling on my Republican colleagues to stand up and declare where you are on this," Jensen said. "Enough is enough, let's meet this moment."  Montemayor, Steven.  "GOP candidate Scott Jensen calling for 'civil disobedience' of COVID policies."  *Star Tribune*, 10 September, 2021, https://www.startribune.com/gop-candidate-scott-jensen-calling-for-civil-disobedience-of-covid-policies/600095847/?refresh=true, (last accessed June 5, 2023).

172.    This too would later be considered "practicing medicine" within the jurisdiction of the Board.

173.    Meanwhile, nearly six weeks had elapsed without any updates from the Board on Complaint Four, which led to an email by Dr. Jensen addressed to Mr. Anderson September 29, 2021, asking, "what is the status of my investigation?"

174.    The next day, Mr. Anderson responded via email to say that "[t]he Complaint Review Committee decided to dismiss the complaint. I will send you formal notice of the Committee's decision within the next week."

175.    On September 30, 2021, the BMP addressed a letter to Dr. Jensen ("Dismissal Notice Three"), signed by Mr. Anderson.

176.    Dismissal Notice Three concerned the same subject as Complaint Four.

177.    Dismissal Notice Three stated that the BMP "has conducted an investigation of a complaint related to a petition for temporary restraining order filed by America's Frontline Doctors in U.S. District Court in May 2021."

178.    Dismissal Notice Three went on to state that, "[a]fter a thorough review of both the Medical Practice Act and the facts of the situation, including those that you have provided, the Board has decided to dismiss the complaint and close its investigation at this time."

179.    Unlike the previous dismissal notices Dr. Jensen received, Dismissal Notice Three further stated: "However, the investigation may be re-opened in the future if the Board receives information that was not previously considered during the initial investigation of the complaint, or if the Board receives similar complaints or reports regarding your practice of medicine."

180.    This statement was intended to chill Dr. Jensen's speech.

181.    Finally, Dismissal Notice Three stated that "[t]his complaint is not public, but will remain on file."

182.    Like the admonishment in Complaint Three, this statement was also meant to chill Dr. Jensen's speech by telling him that the complaint and affidavit petitioning for the TRO would be kept by the Board for future adverse action against him.

183.    Having announced his intention to run for Governor more than 6 months earlier, Dr. Jensen was eager to focus on his campaign without the specter of an unlawful BMP investigation hanging over his head.

**The BMP Investigates Dr. Jensen for His Protected Speech for the Fifth Time**

184.    Less than three weeks after Dr. Jensen received the BMP's Dismissal Notice Three, on October 21, 2021, the BMP addressed a fifth letter regarding a "Notice of Board Complaints" to Dr. Jensen ("Complaint Five") that was again signed by Mr. Anderson.

185.    The subject line to Complaint Five read "RE: Notice of Board Complaints" and cited to "Board File Nos: BFA09210186, BFA10210192, BFA10210193, BFA10210197, BFA10210223, BFA10210224, BFA10210225, BFA10210226, BFA10210227, BFA10210228."

186.    Complaint Five stated that "[b]etween September 14 and October 4, 2021, the Board received multiple complaints against your license related to concerns about the COVID-19 pandemic."

187.    Complaint Five stated that "[i]n accordance with Minnesota law, the Board is required to notify a licensee of all complaints and reports wherein violations of the Medical Practice Act are alleged, including but not limited to Minn. Stat. § 147.091, subd. 1(g) and (k)."

188.    Complaint Five summarized the "complaint allegations" as follows:

   a.   "It is alleged that you are using your position as a medical provider to *spread misinformation* regarding the COVID-19 pandemic, including 'calling for civil disobedience' among Minnesotans and businesses to ignore vaccine and mask guidance' [sic]" (emphasis added);

   b.   "It is alleged that you are not vaccinated and are putting patients at risk by not wearing masks in the patient care setting, and you are inappropriately recommending against children wearing masks in schools;"

   c.   "It is alleged that you are inappropriately 'politicizing public health' at your *campaign events*. Specifically, during a *public speech* on September 20,

2021, you reportedly stated, 'We have 19 years of data that says masks don't do the job...They have a 10% filtration rate.' Additionally, you reportedly compared the vaccines to 'chemotherapy for cancer' (emphasis added);"

d.   "It is alleged that you are telling your 'followers' that hospitals and doctors are falsifying death certificates and changing the cause of death to COVID-19;"

e.   "It is alleged that you are inappropriately promoting the use of ivermectin to treat COVID-19 symptoms;" and

f.   "It is alleged that you are inappropriately promoting the benefits of natural immunity and over vaccines."

       *See* **Exhibit 5**, attached hereto.

189.   The use of social media posts as a basis for investigation is again directly at odds with Executive Director Martinez's stated Board policy.

190.   Dr. Jensen's postings on social media do not concern patient-care complaints or the offer or performance of a medical procedure.

191.   Thus, the Board and the CRC applied different standards to Dr. Jensen based on the content of his speech.

192.   None of these allegations were made by patients of Dr. Jensen.

193.   None of these allegations concern patient-care complaints or the offer or performance of a medical procedure.

194.   All of these allegations concern public statements made by Dr. Jensen.

195.   All of these allegations concern speech protected by the First Amendment.

196.   None of these allegations allege conduct that the Board is empowered to enforce under the standard for professional speech provided in *NIFLA*.

197.   The Board was neither permitted nor required by law to investigate Dr. Jensen's speech.

198.   If the Board were permitted or required by law to investigate Dr. Jensen's speech, the statute requiring that investigation would be facially unconstitutional.

199.   In fact, the Board's investigation of allegations against Dr. Jensen under Minn. Stat. § 147.091, subd. 1(g) may *never* extend to speech on matters of public concern unrelated to the offer or performance of a medical procedure.

200.   The Board's investigation of the allegations against Dr. Jensen under Minn. Stat. § 147.091, subd. 1(g) is unconstitutional, facially and as-applied, because the statute inherently targets speech, and the investigation did in fact target Dr. Jensen's speech.

201.   Minn. Stat. § 147.091, subd. 1(k), addresses "[c]onduct that departs from or fails to conform to the minimal standards of acceptable and prevailing medical practice in which case proof of actual injury need not be established."

202.   The allegations in Complaint Five relate only to protected speech, not conduct, and so the Board had no authority or jurisdiction to investigate them.

203.   The Board's investigation of the allegations against Dr. Jensen for violation of Minn. Stat. § 147.091, subd. 1(k) is unconstitutional as-applied because the investigation used the pretext of investigating conduct to target Dr. Jensen's speech.

204.   Complaint Five notified Dr. Jensen "that the above-referenced complaints will be reviewed by the Board's Complaint Review Committee."

205. Complaint Five directed Dr. Jensen that "[i]f you would like to submit a written response for the Committee's review, please submit your response and any supporting materials by November 12, 2021."

206. Finally, as with Complaint One, Two, and Four, Complaint Five stated that "as a licensee of the Board, you are required to cooperate fully with the investigation into this matter. Failure to cooperate could result in disciplinary action by the Board."

207. On November 9, 2021, Dr. Jensen responded to the BMP's Complaint Five ("Response Four").

208. In his Response Four, Dr. Jensen provided over nineteen pages including a single-spaced written response and similar scholarly and medical studies to those he had submitted in response to the prior complaints. He also noted that "[t]his is the fifth time you have investigated me in the last 17 months."

209. In his Response Four, Dr. Jensen expressed his "serious concerns that an appointed executive branch agency holds the power to revoke a citizen's right to work in his chosen profession because he exercised his right of free speech."

210. On December 21, 2021, the BMP addressed a follow-up letter to Dr. Jensen's Response Four that was signed by Mr. Anderson.

211. The subject line to the BMP's follow-up letter read "RE: Investigation of Board Complaints — Additional Information Requested" and cited to the same Board file numbers as in Complaint Five.

212. In its follow-up letter, the BMP acknowledged receipt of Dr. Jensen's Response Four and "requested" that, "[p]ursuant to the Board's investigation of this matter,

please provide the following records: Copies of medical records for the most recent 3-5 patients to whom you prescribed ivermectin to treat COVID-19."

213.   The BMP's follow-up letter "requested" these records by January 12, 2022.

214.   Finally, as with Complaint One, Two, Four, and Five, the BMP's follow-up letter warned that "as a licensee of the Board, you are required to cooperate fully with the investigation into this matter. Failure to cooperate could result in disciplinary action by the Board."

215.   In early January, 2022, Dr. Jensen sent to the BMP the information requested in its follow-up letter, including medical journals and supporting documents.

216.   For more than one year, from the date Dr. Jensen submitted the follow-up information for Complaint Five, until January 25, 2023, Dr. Jensen received no further communications from the BMP regarding the status of Complaint Five.

217.   Director Martinez, the Board, and the CRC used Complaint Five and its ever-present threat of further investigation to chill Dr. Jensen's speech for the entirety of 2022, which included the full year of his campaign leading up to the November election for Minnesota Governor.

218.   Two statutes were enacted by the Legislature to safeguard licensee physicians from long, protracted periods of uncertainty while the BMP carries out its statutory process.  Both were disregarded by the BMP in order to chill Dr. Jensen's speech, and to retaliate against him for comments he made which were critical of the Board and inconsistent with the preferred narrative surrounding COVID-19.

219.   First, Minnesota Statute § 214.103 Subd. 1a (c) requires that "[t]he Board shall periodically, but no less than every 120 days, notify the licensee of the status of the complaint consistent with section 13.41."

220.   Second, Minnesota Statute § 214.103 Subd. 1a (e) requires that "[n]o more than one year after receiving a complaint regarding a licensee, the board must resolve or dismiss the complaint unless the board determines that resolving or dismissing the complaint cannot reasonably be accomplished in this time and is not in the public interest."

221.   Here, in its October 21, 2021 Notice of Board Complaints (Complaint Five), the BMP alleged that it "…received multiple complaints" against Dr. Jensen's license "between September 14 and October 4, 2021."  As with Complaints One through Four, the allegations outlined in Complaint Five all involved his public speech, including social media posts and a speech at a campaign event.

222.   The previous complaints were all resolved by dismissal well within the 120-day period required by Minnesota Statute § 214.103 Subd. 1a (c), meaning that the notice requirement was satisfied in each of those examples.[1]  Notably, Complaint Three was reviewed by the CRC in March, 2021 pursuant to a January, 2021 allegation involving social media posts.  It was dismissed on April 1, 2021 before Dr. Jensen was notified of its existence.

---

[1]Each and every investigation was unlawful.  Plaintiff does not concede the position that the prior timely notice requirement satisfactions were attached to legal investigations. They were not.

223.    But in Complaint Five, not only was the 120-day notice requirement in §

214.103 Subd. 1a (c) ignored no fewer than three times for each and every one of the six

complaint allegations contained in it, but the Board also disregarded the provision in §

214.103 Subd. 1a (e) requiring resolution or dismissal of any complaints within a year of

their receipt by the Board.

224.    This deliberate act by the Board allowed it to hold Complaint Five open

during the entirety of Dr. Jensen's campaign, as the statute would have required its

resolution well in advance of election day, and in no event later than October 4, 2022.  This

was done to chill Dr. Jensen's speech during the campaign and to retaliate against him

based on the content of his speech, which was sharply critical of the BMP and the

government's response to COVID-19.

225.    Upon information and belief, the later dismissal of all the charges, as

described below, shows that the Defendants intentionally refrained from dismissing the

charges for the purpose of chilling Dr. Jensen's speech during the gubernatorial campaign.


**The BMP Summons Dr. Jensen to a Conference to Investigate Complaint Five and
All Previously-Dismissed Complaints**

226.    On January 25, 2023, the BMP sent Dr. Jensen a "Notice of Conference"

letter ("Notice"), that was signed by Kathryn Van Etta-Olson, the BMP's Complaint

Review Unit Manager, on behalf of Ruth M. Martinez, the Executive Director of the BMP.

227.    The Notice was addressed, "In the Matter of the Medical License of Scott M.

Jensen, M.D."

41

228.   The Notice notified Dr. Jensen that the Board "through its Complaint Review Committee will hold a conference to discuss the above-entitled matter on February 24, 2023."

229.   The Conference date was subsequently moved to March 24, 2023 to allow additional time for Dr. Jensen to arrange for counsel and prepare for the event.

230.   The Notice stated that "[t]he purpose of the conference is to discuss [Dr. Jensen's] ability to practice medicine and surgery with reasonable skill and safety to patients."

231.   The Notice "requested" that Dr. Jensen "provide the Complaint Review Committee, no later than ten days before the date of the conference, with a written response to the allegations herein. Failure to provide a written response may be viewed as a failure to cooperate under Minnesota Statutes sections [sic] 147.131 (2020)."

232.   The Notice stated that "[b]etween April 2020 and June 2022, the Board received 18 complaints related to [Dr. Jensen's] public statements on COVID-19 and patient care."

233.   The Notice thus included years of previously dismissed allegations and even allegations arising after Dr. Jensen had already responded to Complaint Five, with no amended complaint or other notice that new allegations were being considered against Dr. Jensen.

234.   Minnesota Statute §214.103 Subd. 8(b) provides that "The board may reopen a dismissed complaint if the board receives newly discovered information that was not

42

available to the board during the initial investigation of the complaint, or if the board receives a new complaint that indicates a pattern of behavior or conduct."

235.    Under this claimed authority, the Board resurrected and incorporated in the Notice all the complaints previously investigated by the Board--Complaints One, Two, Four, and Five.

236.    The allegations rehearsed in the Notice were:

    a.   "[Dr. Jensen] promulgated disinformation regarding the COVID-19 pandemic, advised against vaccines and masks, including calling for civil disobedience among Minnesotans and businesses to ignore vaccine and mask guidance, and gave advice that promotes the transmission of COVID-19." (See Complaint Five.)

    b.   "[Dr. Jensen] claimed that COVID-19 is nothing more than the flu and falsely compared and minimized the difference between the 2009 H1N1 pandemic and COVID-19." (See Complaint One and Two.)

    c.   "[Dr. Jensen] promoted conspiracy theories alleging the Minnesota Department of Health instructed providers to falsify death certificates to list COVID-19 as the cause of death, whether or not the patient's underlying or contributing cause of death was COVID-19, when Minnesota was following federal guidance as a measure to better define the scope of the pandemic. [Dr. Jensen] was also 'very publicly minimizing' and 'deliberately downplaying' COVID-19 deaths." (See Complaint One, Three, and Five.)

    d.   "[Dr. Jensen] was not vaccinated and was putting patients at risk by not wearing masks in the patient care setting, and he recommended against children wearing masks in school." (See Complaint Five.)

    e.   "[Dr. Jensen] attempted to benefit himself by misconstruing medical information to the public in a manner inconsistent with the recommendations of public health officials during a pandemic. Specifically, during a speech on September 20, 2021, [Dr. Jensen] stated, 'We have 19 years of data that says masks don't do the job...They have a 10% filtration rate.' Additionally, [Dr. Jensen] compared the vaccines to 'chemotherapy for cancer.'" (See Complaint Five)

    f.   "[Dr. Jensen] advised patients to take ivermectin without scientific data to support their use in the treatment of patients with COVID-19." (See Complaint Five.)

g.  "[Dr. Jensen] promoted the benefits of natural immunity over vaccines." (See Complaint Five.)

h.  "On May 20, 2021, [Dr. Jensen] filed a temporary restraining order ("TRO") in the U.S. District Court for Alabama. The TRO was filed against the emergency use authorization permitting the use of COVID-19 vaccines in children under the age of 16. The TRO claimed that children under the age of 16 'are at 0% risk of death, and that [children] [sic] are not at risk of harm from COVID-19.'" (See Complaint Four.)

i.  "[Dr. Jensen] falsely claimed to have been a professor at the University of Minnesota medical school for over 30 years when [he] was a clinical associate."

*See* **Exhibit 6**, attached hereto.

237.  None of these allegations were made by patients of Dr. Jensen.

238.  None of these allegations concern patient-care complaints or the offer or performance of a medical procedure, with the only possible exception being the alleged prescription of ivermectin to patients. But Defendants knew or should have known that prescribing ivermectin "off label" did not violate any rules of conduct for a medical doctor such as Dr. Jensen.

239.  All of these allegations concern public statements made by Dr. Jensen.

240.  All of these allegations concern speech protected by the First Amendment.

241.  None of these allegations allege conduct that the Board is empowered to enforce under the standard for professional speech provided in *NIFLA*.

242.  The Notice went on to rehearse some of the written responses Dr. Jensen previously submitted in response to the Board's requests for additional information for the previous complaints.

243. The Notice stated that "[a] review of [Dr. Jensen's] patient medical records where [he] prescribed Ivermectin revealed the following:"

    a. "[Dr. Jensen's] medical record documentation was often illegible."

    b. "In addition to Ivermectin, [Dr. Jensen] prescribed other medications off-label to treat COVID-19."

    c. "[Dr. Jensen] did not document rationale for treating patients with specific medications and did not document any informed consent discussion regarding using medications off-label."

244. The Notice stated that the subject conference was called at the recommendation of the Complaint Review Committee "to discuss the allegations above" after the Complaint Review Committee "reviewed the matter."

245. Complaint Five alleged "…18 complaints related to [Dr. Jensen's] public statements on COVID-19 and patient care."  Significantly, adding up all the alleged "violations of professional conduct" in the prior complaints only produces 13, not 18.  Even after adding the three new alleged "violations" of the Medical Practice Act concerning medical record documentation, Ivermectin, and documentation of rationale for off-label prescriptions, the sum total does not reach 18.

246. This means that there were at least two, and as many as five, complaints that were received *and investigated* by the BMP that Dr. Jensen was held to account for but had absolutely no opportunity to address.

247. The Notice stated that the conduct alleged therein "would constitute a violation of Minn. Stat. § 147.091, subd 1 (g), (k), (o), and (s) (2020)."

45

248.    Minn. Stat. § 147.091, subd. 1(o), addresses the "[i]mproper management of medical records, including failure to maintain adequate medical records, to comply with a patient's request made pursuant to sections 144.291 to 144.298 or to furnish a medical record or report required by law."

249.    Minn. Stat. § 147.091, subd. 1(s), addresses the "[i]nappropriate prescribing of or failure to properly prescribe a drug or device, including prescribing a drug or device for other than medically accepted therapeutic or experimental or investigative purposes authorized by a state or federal agency."

250.    The Notice stated that "[p]ursuant to Minnesota Statutes section 147.131 (2020), [Dr. Jensen] is required to cooperate fully with the Board. Cooperation includes responding fully and promptly to any questions raised by or on behalf of the Board relating to the subject of the investigation, executing all releases requested by the Board, providing copies of client records, and appearing at conferences or hearings scheduled by the Board or its staff."

251.    The Notice stated that "[a]ny one or a combination of the following actions could be taken as a result of or following the conference:"

a.  "The Complaint Review Committee could conclude the matter based upon its determination that there are insufficient grounds for discipline;"

b.  "The Complaint Review Committee could enter into an agreement with [Dr. Jensen] for corrective action;"

c.  "The Complaint Review Committee and [Dr. Jensen] could enter into a stipulation permitting the full Board to issue a mutually agreed upon disciplinary order or remedy; or"

46

d.  "The Complaint Review Committee could determine that the matter will be satisfactorily resolved only by a contested case hearing conducted in accordance with the Minnesota Administrative Procedure Act."

252.  The Notice stated that "the conference is designed to permit the Complaint Review Committee to seek and clarify information, to provide [Dr. Jensen] with an opportunity to clarify a possible misunderstanding, and to allow the Complaint Review Committee and [Dr. Jensen] to seek resolution and remedy of any possible problems without the necessity of instituting a formal case."

253.  Dr. Jensen's conference with the Complaint Review Committee occurred on March 24, 2023.  For more than an hour, he was repeatedly compelled by a panel of Defendant Board members, BMP officials, and a representative from the OAG, to answer questions about his public statements which ran contrary to the narrative advanced by Dr. Jensen's political opponents.

254.  This conference was held in retaliation for Dr. Jensen's protected First Amendment speech and not medical conduct which the Board was empowered to regulate.

255.  This conference was held to chill Dr. Jensen from continuing to speak in a manner contrary to the government's preferred narrative surrounding COVID-19.

## CAUSES OF ACTION

### Count One
### 42 U.S.C. §§ 1983
### Violation of the U.S. Constitution,
### First Amendment – Abuse of Investigatory Power and Chilling Effect

256.  Plaintiff reincorporates the foregoing as if fully written herein.

257.    Minnesota and federal statutory and constitutional law specifically limit the authority of the Board of Medical Practice and its members to investigation related to professional conduct, not political speech. Political speech may not be investigated by Defendants.

258.    Plaintiff has made a number of political statements about COVID-19 and the government response thereto over the course of several years, as a Minnesota Senator, as a private citizen, and as a major-party nominee for Governor of Minnesota.

259.    In addition, Plaintiff petitioned the government when he became a plaintiff and submitted an affidavit in support of a lawsuit that sought a temporary restraining order against the U.S. government's emergency use authorization permitting the use of COVID-19 vaccines in children under the age of sixteen ("TRO Lawsuit").

260.    The legitimacy of the government response to COVID-19, the efficacy of vaccines and the propriety of recommending them or mandating them for use in children, and the other related matters on which Plaintiff has opined are all broad issues of social and political interest to society at large.

261.    Defendants initiated all five Complaints related to Plaintiff based almost entirely on his political speech. Only in Complaint Five was there any mention of items which could be considered "conduct": the alleged prescription of ivermectin, Dr. Jensen's handwriting being difficult to read, and documentation of informed consent.  Each of these allegations were brought to bear against him *only* as a result of the unlawful investigations into Dr. Jensen's speech.

262.   Plaintiff's speech was a substantial or motivating factor for Defendants' investigations. Minn. Stat. 147.091, subd. 1(g) and (k).

263.   Defendants had no authority to initiate an investigation into Plaintiff based on political speech.

264.   Defendants had no authority to initiate an investigation into Plaintiff based on his participation in the TRO Lawsuit.

265.   Defendants used their investigative power solely to chill Dr. Jensen's political speech, and they intended to chill Dr. Jensen's speech because Defendants were not required to investigate frivolous complaints and demand written responses and production of documents based only on speech, which is beyond the Defendants' jurisdiction.

266.   Defendants could not have been required to "investigate" every Complaint related to a medical professional because, unlike their conduct in Complaints One, Two, Four, and Five, they did not demand written responses and production of documents connected to Complaint Three.

267.   If Defendants *were* required to "investigate" Complaints One, Two, Four, and Five, including demanding written responses and production of documents, then Minn. Stat. § 147.091, subd. 1(g) is unconstitutional, both facially and as-applied, and Minn. Stat. §147.091, subd. 1(k) is unconstitutional as applied to Dr. Jensen.

268.   Defendants refused to dismiss Complaints One, Two, Four, and Five against Dr. Jensen without subjecting him to further inquiry in order to chill his speech, And the notices of dismissal post-investigation were also designed to chill his speech.

269.   Defendants' actions would chill a person of ordinary firmness from petitioning or continuing to petition the government.

270.   Defendants have neither a substantial nor a compelling interest to justify investigating Plaintiff for petitioning the government.

271.   Defendants' actions are not narrowly tailored to any claimed government interest in regulating the medical profession because political speech is not within the ambit of Defendants' jurisdiction.

272.   Defendants' investigation subjected Plaintiff to the present harm of expending time and money to respond to the investigation as well as the potential future harm of disciplinary or corrective action, including adverse action against his medical license.

273.   Plaintiff asks the Court to declare that Defendants violated his constitutional rights, and to award him nominal, actual, general, and compensatory damages for damage to his personal dignity, reputation, and constitutional rights. Plaintiff also seeks punitive damages because Defendants' actions were willful or with reckless indifference to Plaintiff's constitutional rights. To the extent Defendants may argue that they were required by law to undertake their investigations into Plaintiff's speech pursuant to Minn. Stat. § 147.161, subd. 1, those portions of the statute are unconstitutional, both facially and as-applied.

**Count Two**
**42 U.S.C. §§ 1983**
**Violation of the U.S. Constitution,**
**First Amendment Free Speech Clause**
**Retaliation**

274.    Plaintiff reincorporates the foregoing as if fully written herein.

275.    The First Amendment prohibits the government from "abridging the freedom of speech." U.S. Const., Amend. 1.

276.    Plaintiff engaged in protected speech when he spoke at or through public forums, such as campaign rallies, news interviews, and online social media platforms, on matters of public concern.

277.    Defendants initiated multiple investigations into Plaintiff on the basis of his exercising his right to free speech.

278.    Defendants initiated their investigations against Plaintiff in retaliation for his exercising his right to free speech.

279.    Plaintiff's speech was a substantial or motivating factor for Defendants' investigation, which investigation was grounded on Plaintiff's speech constituting "unethical or improper conduct" and/or "depart[ing] from or fail[ing] to conform to the minimal standards of acceptable and prevailing medical practice." Minn. Stat. 147.091, subd. 1(g), (k).

280.    Defendants' actions would chill a person of ordinary firmness from exercising or continuing to exercise his right to freely express his opinions on matters of public concern.

281.    Defendants have no compelling interest to justify investigating Plaintiff for protected speech.

**Count Three**

51

**42 U.S.C. §§ 1983**
**Violation of the U.S. Constitution,**
**First Amendment Free Speech Clause**
**Viewpoint Discrimination**

282.    Plaintiff reincorporates the foregoing as if fully written herein.

283.    The First Amendment prohibits the government from "abridging the freedom of speech." U.S. Const., Amend. 1.

284.    Plaintiff engaged in protected speech when he spoke at and through public forums, such as campaign rallies, television and radio interviews, and online social media platforms, on matters of public concern.

285.    Defendants initiated multiple investigations into Plaintiff's speech, including but not limited to demanding written responses and production of documents under threat of further sanctions for failure to cooperate because of the viewpoint he expressed in his speech.

286.    Defendants' investigations purported to scrutinize Plaintiff's viewpoint as constituting either "unethical or improper conduct" or "depart[ing] from or fail[ing] to conform to the minimal standards of acceptable and prevailing medical practice." Minn. Stat. 147.091, subd. 1(g), (k).

287.    Upon information and belief, Defendants have not initiated any investigations into medical doctors who have publicly made statements about the government response to COVID-19 with a viewpoint which called for greater restrictions on individuals, contrary to Dr. Jensen's political message.

288.    To the extent Defendants may argue that they were required by law to undertake their investigations into Plaintiff's speech pursuant to Minn. Stat. § 147.161, subd. 1, the statute is unconstitutional, both facially and as-applied.

289.    Defendants' actions would chill a person of ordinary firmness from exercising or continuing to exercise his right to freely express his viewpoint on matters of public concern.

290.    Defendants have no compelling interest to justify investigating Plaintiff for the content of his protected speech.

291.    Defendants' investigation subjected Plaintiff to the present harm of expending time and money to respond to the investigation as well as the potential future harm of disciplinary or corrective action, including adverse action against his medical license.

### Count Four
### Class-of-One Equal Protection Violation
### U.S. Const. amend. XIV; Minn. Const. art. I, § 2
### 42 U.S.C. § 1983; 28 U.S.C. § 2201, *et seq.*; Minn. Stat. § 555.01, *et seq.*

292.    Plaintiff reincorporates the foregoing as if fully written herein.

293.    The Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution provides, in relevant part, that "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws.

294.    The Equal Protection Clause applies to states and their subdivisions and municipalities.

295.    By launching a series of investigations based on the content of Dr. Jensen's speech where the Board lacked jurisdiction, the Defendants intentionally treated Dr. Jensen differently than they treat others similarly situated to him.

296.    Upon information and belief, no licensees subject to regulation by the Board were investigated under Minn. Stat. §214.103 for spreading information on a television station about COVID-19 contrary to Dr. Jensen's political message, or for claiming that the Minnesota Department of Health *did not* instruct providers to list COVID-19 as the cause of death on death certificates regardless of whether a patient died of COVID-19.

297.    Upon information and belief, no licensees subject to regulation by the Board were investigated under Minn. Stat. §214.103 for providing contrary advice [regarding COVID-19] compared to Dr. Jensen.

298.    Upon information and belief, no licensees subject to regulation by the Board were investigated under Minn. Stat. §214.103 for posting Facebook videos containing information and conclusions about COVID-19 and the government response to it contrary to Dr. Jensen's political message.

299.    Upon information and belief, no licensees subject to regulation by the Board were investigated under Minn. Stat. §214.103 for emphasizing the differences between the 2009 H1N1 pandemic and COVID-19.

300.    Upon information and belief, no licensees subject to regulation by the Board were investigated under Minn. Stat. §214.103 for becoming involved in a lawsuit that advocated in favor of the emergency use authorization permitting the use of COVID-19 vaccinations in children under the age of 16.

301.    There is no rational basis for treating Dr. Jensen differently than any other physician who wishes to engage in speech protected by the First Amendment.

302.    The Defendants' actions are irrational and arbitrary.

303.    Upon information and belief, the Defendants also treat other individuals who might speak to the public about actions taken by the government differently than they have treated Dr. Jensen, with no rational basis for any such distinction.

304.    The Defendants' violation of Dr. Jensen's Fourteenth Amendment rights have caused him actual, nominal, and general damages, including damages related to his personal dignity because of the violation of his constitutional rights.

305.    Should Dr. Jensen prevail in this matter, Dr. Jensen is entitled to costs and disbursements incurred in this matter.

306.    Should Dr. Jensen prevail in this matter, the Court should award attorney fees to Dr. Jensen and against Defendant pursuant to an appropriate post-judgment motion for the same.

**Count Four**
**Unconstitutional Conditions**
**42 U.S.C. §§ 1983, 1988**
**28 U.S.C. § 2201,** *et seq.*

307.    Plaintiff incorporates the preceding paragraphs by reference.

308.    Medical professionals cannot be forced to trade their constitutional rights for the benefit of their government-issued license: "[The government] may not deny a benefit to a person on a basis that infringes his constitutionally protected interests -- especially, his

interest in freedom of speech." *Perry v. Sindermann*, 408 U.S. 593, 597, 92 S. Ct. 2694, 2697 (1972).

309.    Further, because expression on "public issues has always rested on the highest rung of the hierarchy of First Amendment values,…mandating that [individuals] affirmatively espouse the government's position on a contested public issue where the differences are both real and substantive" runs afoul of the unconstitutional conditions doctrine. *All. for Open Soc'y Int'l, Inc. v. United States Agency for Int'l Dev.*, 651 F.3d 218, 236 (2d Cir. 2011).

310.    This is especially true where the government "compels [individuals] to voice the government's viewpoint and to do so as if it were their own." *Id.* at 237.

311.    Dr. Jensen cannot be forced to give up his beliefs or rights in order to keep his medical license.

312.    Dr. Jensen cannot be forced to respond, over and over, expending his own time and resources, to illegitimate investigations of his license based on his exercise of constitutional rights.

313.    Defendants' repeated illegal investigations of Dr. Jensen create unconstitutional conditions for his retention of his medical license because they force him to remain silent on issues of public concern or else face censure.

314.    The Defendants' actions thus violate the unconstitutional conditions doctrine.

315.   Absent injunctive and declaratory relief against the Defendants' application of their investigatory power against Dr. Jensen because of his political speech, Dr. Jensen has been and will continue to be irreparably harmed, so Plaintiff asks for that relief.

316.   Plaintiff asks the Court to award nominal, actual, compensatory, general, and punitive damages for the Defendants' intentional and illegal investigations of his political speech.

317.   Plaintiff also asks the Court to award Plaintiff reasonable attorney fees under 42 U.S.C. § 1988, and all taxable costs and disbursements, after appropriate motions or applications for the same.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Dr. Scott Jensen respectfully requests that the Court enter judgment against Defendants and provide him with the following relief:

A.  A declaratory judgment that the Defendants violated Plaintiff's rights under the First and Fourteenth Amendments to the United States Constitution, Article I, sections 2 and 3 of the Minnesota Constitution, and the unconstitutional conditions doctrine;

B.  An award of nominal damages in favor of Plaintiff because of Defendants' violations of Plaintiff's rights under the First and Fourteenth Amendments to the United States Constitution, Article I, sections 2 and 3 of the Minnesota Constitution, and the unconstitutional conditions doctrine;

C.  An award of injunctive relief prohibiting Defendants from any future investigations into Plaintiff's protected First Amendment speech;

D.  An award of actual, general, and compensatory damages in an amount to be proven at trial, including any damages or penalties available at law;

E.  Reasonable attorneys' fees, costs, and other costs and disbursements in this action pursuant to 42 U.S.C. § 1988 and upon proper post-judgment application for the same;

F.  An award of punitive damages in favor of Plaintiff for the intentional deprivation of, or deprivation with callous disregard to, Plaintiff's constitutional rights.

G.  All and any further relief to which Plaintiff may be entitled; and

H.  A trial by jury of all such matters properly tried as such is requested.


Respectfully submitted,

**JOSEPH LAW OFFICE PLLC**

Dated:  June 6, 2023

*/s/ Gregory J Joseph*
Gregory J Joseph (#0346779)
300 E Frontage Road
Waconia, MN  55387
josephlawoffice@protonmail.com
(612) 968-1397

**UPPER MIDWEST LAW CENTER**

Douglas P. Seaton (#127759)
James V. F. Dickey (#393613)
8421 Wayzata Blvd., Suite 300
Golden Valley, Minnesota 55426
James.Dickey@umlc.org
(612) 428-7000


*Attorneys for Plaintiff*