## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| DR. SCOTT JENSEN, | Court File No. 23-CV-01689-JWB-DTS |
| Plaintiff, | |
| v. | |
| MINNESOTA BOARD OF MEDICAL PRACTICE; RUTH MARTINEZ, ELIZABETH A. HUNTLEY, CHERYL L. BAILEY, JOHN M. MANAHAN, PETER J. HENRY, in both their individual and official capacities as members of the Minnesota Board of Medical Practice; BRIAN ANDERSON in his individual and official capacity as a medical regulations analysts for the Minnesota Board of Medical Practice, JANE ROES 1-12, in both their individual and official capacities as members of the Minnesota Board of Medical Practice; and JOHN DOES 1-4, in both their individual and official capacities as members of the Minnesota Board of Medical Practice, | **PLAINTIFF'S MEMORANDUM** **OF LAW IN OPPOSITION TO** **DEFENDANTS' MOTION TO DIMISS** |
| Defendants. | |

### INTRODUCTION

Plaintiff Dr. Scott Jensen is a licensed physician and has been practicing medicine in good standing in Minnesota for more than 40 years. He has never been the subject of any investigation based on a complaint by any patient he has ever treated. In addition to his practice of family medicine, he served the people of Minnesota as a Republican State Senator from District 47 from the years 2017 through 2021. Dr. Jensen was vice-chair of

the Senate Health and Human Services Committee during the entirety of his term. As such, he was the chief senate author of two major health-care policy bills, and he developed a reputation for questioning the official narrative surrounding COVID-19, particularly related to the executive branch government reaction to it. Dr. Jensen announced in March 2021 his candidacy for Governor of the State of Minnesota, and he won the Republican endorsement for the same in June 2022. Throughout this time, Dr. Jensen spoke frequently about his views on the government response to COVID-19 and various issues related to COVID-19.

Between July of 2020 and March of 2023, under the guise of "regulating professional conduct," the Minnesota Board of Medical Practice ("BMP" or "Board") systematically launched a series of "investigations" into Dr. Jensen's license to practice medicine after he engaged in protected political speech related to COVID-19. The Complaint details these "investigations" and their basis, which overwhelmingly related to Dr. Jensen's political speech. The Complaint thus alleges facts which are more than sufficient to establish prima facie claims for the numerous First Amendment violations committed over a nearly three-year period by Defendants. The process was the punishment, as Defendants disregarded the Constitution and Supreme Court precedent directly on point and misused state statutes designed to protect regulated persons from abuses just like these.

Moreover, the record is replete with allegations and inferences that Defendants' conduct, which caused the deprivations of Dr. Jensen's First Amendment rights, was intentional. The Defendants knew they had no authority to regulate Dr. Jensen's political speech, and they knew they could dismiss complaints by unreasonable, angry, and overly

political citizens with no patient relationship to Dr. Jensen without forcing him to respond to frivolous complaints. Yet the Defendants chose to wield their investigatory power as a cudgel, launching investigation after investigation—during a political campaign—into allegations obviously beyond the jurisdiction of the Board and its members. This was objectively unreasonable. The Board and its members made at least eighteen separate and independent unlawful decisions as to the Board's jurisdiction over Dr. Jensen's political speech, all of which resulted in egregious violations of the First Amendment.

The Complaint alleges all of these prima facie examples of retaliation, viewpoint discrimination, equal protection violations, and chilling of protected speech caused by Defendants' extra-jurisdictional "investigations." Defendants' Memorandum reflects an ongoing and alarming misunderstanding of the Board's authority to regulate speech by Minnesota physicians, revealing a far-too-broad interpretation of the duties and authority of the Board and its members. For these and other reasons discussed herein, Defendants' motion to dismiss should be denied.

## FACTS

In the 2022 state and federal elections, unlike any other year perhaps in this nation's history, the government's response to an international health crisis was on the ballot. To say that COVID-19 has been divisive in American society is an understatement. Against this backdrop, Dr. Scott Jensen, a career family physician and former state senator, announced his candidacy for Governor of the State of Minnesota in the Spring of 2021. Compl. ¶1. As a candidate, Dr. Jensen vocally opposed Governor Walz's responses to the

pandemic, including forced closure of businesses and churches, mandates, and lockdowns. Compl. ¶12.

But Dr. Jensen faced an executive branch political foe of a different sort: the Defendants here, the Minnesota Board of Medical Practice ("BMP" or "Board") and its members. At the time he announced his intention to run, he was in the middle of a years-long set of unlawful, extra-jurisdictional "investigations" into his protected political speech under the guise of regulating the practice of medicine. Compl. ¶4. The Board used the "Attempts at Resolution" powers outlined in Minn. Stat. §214.103, subdivision 6 to carry out various demands for written responses, document production, and ultimately an in-person conference to address Dr. Jensen's speech. Compl ¶¶43, 51. But before it could lawfully exercise these powers, the board was required to determine that it had jurisdiction in compliance with the "Receipt of Complaint" process in Minn. Stat. §214.103, subd 2. Compl. ¶45. It provides, in part, as follows:

> The executive director or the designated board member shall determine whether the complaint alleges or implies a violation of a statute or rule which the board is empowered to enforce. The executive director or the designated board member may consult with the designee of the attorney general as to a board's jurisdiction over a complaint.

Minn. Stat. §214.103, subd 2. Contrary to Defendants' repeated insistence throughout their Memorandum that the Board was merely "fulfilling its statutory duty" to investigate complaints it receives,[1] the "duty" described in the statute only applies to allegations made

---

[1] *See* Defs.' Mem. of Law in Supp. of Mot. To Dismiss (hereinafter "Defs.' Mem."), ECF No. 28, July 21, 2023, at 3, 4, 5, 13, 18, 22, 24, 26.

4

against physicians that concern the *practice of medicine,* and can never apply to First Amendment protected political speech. Compl. ¶46. To the extent that the statute does provide the BMP with authority to regulate protected speech, it is facially unconstitutional. The statute is written to govern complaints related to professional conduct; it was the misuse of the statute by the BMP over nearly three years that gave rise to this lawsuit.[2] In other words, the Board had a statutory duty *not* to investigate the complaints against Dr. Jensen involving his public, political speech over which it had no jurisdiction, which in this case was all of them.

The exclusive bases for the investigation of Complaints 1-5 concerned the alleged violation of Minn. Stat. §§147.091 Subd 1(g) and 1(k). Compl. Exs. 1-5. Subdivision 1(g) prohibits:

> (g) Engaging in any unethical or improper conduct, including but not limited to:

> (1) conduct likely to deceive or defraud the public;

> (2) conduct likely to harm the public;

> (3) conduct that demonstrates a willful or careless disregard for the health, welfare, or safety of a patient;

> (4) medical practice that is professionally incompetent; and

> (5) conduct that may create unnecessary danger to any patient's life, health, or safety, in any of which cases, proof of actual injury need not be established.

---

[2] Minn. Stat. §§ 147.091, subd. 1(g)(1)-(2) and (k) are also unconstitutional both facially and as-applied

Minn. Stat. §147.091 Subd 1(g). The only allegations made against Dr. Jensen in the Complaints related to his speech and not to the doctor-patient relationship, *see* Compl. Exs. 1-5, so the only conceivable bases for alleged violation of subdivision 1(g) would fall under paragraphs 1 and 2. Subdivision 1(k) governs "[c]onduct that departs from or fails to conform to the minimal standards of acceptable and prevailing medical practice in which case proof of actual injury need not be established." Both statutes are unconstitutional for some of the same reasons, including their allowance for all manner of speech to be swept into their purview. Compl. ¶¶35, 85, 86, 115, 163, 203, 267.

## The Board Investigations
## Complaint 1

On June 22, 2020, Defendants sent Dr. Jensen his first Complaint, which was a collection of allegations made against him by members of the public. *See* Compl. ¶79 & Ex. 1. Defendants do not dispute that Complaint 1, among others, exclusively involved comments that Plaintiff made to the general public. Compl. ¶73 & Ex. 1; Defs.' Mem. 13, 21. Complaint 1 demanded a written response—under penalty of further disciplinary action if he refused—and lodged the following allegations against him:

> "It is alleged that you were 'spreading misinformation [regarding COVID-19] on a regional tv station [i.e. KXJB-TV],' claiming that the Minnesota Department of Health instructed providers to list COVID-19 as the cause of death on death certificates regardless of whether a patient died of COVID-19;" (brackets in original); and

> "It is alleged that you also provided 'reckless advice [regarding COVID-19] over social media,' stating that COVID-19 'is nothing more than the flu.'"

Compl. ¶76 & Ex. 1 (brackets in original). Both allegations claimed a potential violation of section 147.091, subd. 1(g). Compl. ¶74. Notably, these allegations also reveal the

6

distinction between the practice of medicine, which is subject to Board regulation, and Dr. Jensen's commentary thereon, which is protected speech. The Board demanded a written response and production of "relevant documentation you have received from the Minnesota Department of Health regarding COVID-19," with the following admonishment: "…as a licensee of the Board, you are required to cooperate fully with the investigation into this matter. Failure to cooperate could result in disciplinary action by the Board." Compl. ¶89 & Ex. 1.

As the subject of a disciplinary action which had been commenced against him on these grounds, and after hundreds of hours of extensive research, Dr. Jensen provided Defendants with a 60-page response, including scholarly journals and medical literature in addition to a lengthy typewritten narrative. Compl. ¶91. Complaint 1 was dismissed on July 27, 2020. Ex. 1.

### Complaint 2

The Defendants initiated Complaint 2 on September 1, 2020 – just over a month after the first Complaint was dismissed. Compl. ¶99 & Ex. 2. It stated that a complaint received was "alleging that you continue to mislead and lie to the public about COVID-19"—in other words, it solely focused on Dr. Jensen's speech:

> "On July 20 and 21, 2020, you posted Facebook videos that contain false and misleading information and conclusions;"
> "You falsely compare and minimize the difference between the 2009 H1N1 pandemic and COVID-19;" and
> "You are a 'danger to public health.'"

Compl. ¶102 & Ex. 2. The Board cited violations of statutes "including but not limited to Minn. Stat. §147.091, subd 1(g) and (k)," and similarly "invited" a written response and

"supporting materials" to be submitted in less than three weeks from the date of the Complaint. Compl. ¶¶102, 116 & Ex. 2. Complaint 2 also came with the warning that Dr. Jensen was "required to cooperate fully with the investigation into this matter. Failure to cooperate could result in disciplinary action by the Board." Compl. ¶117 & Ex. 2.

Again, Dr. Jensen prepared his written response under penalty of further sanctions against him in the form of discipline or further "investigation." Compl. ¶¶118-119. In this response, he expressed frustration at the vague allegations regarding his public speech, and that they should not form the basis for an investigation into his practice of medicine as they seemed to be little more than attacks of a personal character lodged by ideological opponents designed to "silence words, ideas, and perspectives in conflict with their own." Compl. ¶¶119-120. He specifically noted the chilling effect that the investigation was having on his speech, which interfered with his ability to freely speak to his patients and constituents. Compl. ¶122.

After the "investigation" was complete, and after Dr. Jensen expended significant time and energy complying with BMP demands, Complaint 2 was dismissed by the Board on October 28, 2020. Compl. Ex. 2.

**Complaint 3**

In April 2021, just a few days after he announced his candidacy for Governor, Dr. Jensen received a third letter from the BMP. Compl. ¶129 & Ex. 3. The allegation, again made by a member of the public with no known connection to Dr. Jensen, accused him of "very publicly minimizing and deliberately downplaying COVID-19 deaths. The

complaint included several social media posts purportedly made from your Twitter account since October 2020." Compl. ¶133 & Ex. 3.

This Complaint exclusively involved a member of the public criticizing Dr. Jensen for his social media posts, which the BMP regarded as a potential violation of section 147.091 Subd 1(g). *Id.* This was now the third instance of social media being used as a basis for fact-finding. The social media posts which apparently formed the basis for this letter, also referred to as "Board File No. BFA01210500," are very similar to the allegation in Complaint 2. However, and importantly, unlike any of the other disciplinary actions taken by Defendants, Complaint 3 was dismissed without demanding a written response. Compl. ¶142 & Ex. 3.

At the end of the dismissal letter, the Board reminded Dr. Jensen that Complaint 3, despite its dismissal, "will remain on file." Compl. ¶143 & Ex. 3. Defendants characterize this action, like all the others taken by the Board, as "fulfilling its statutory duty to receive and resolve complaints." Defs.' Mem. 24. Yet Defendants make no attempt to reconcile the disparate treatment of the nearly identical allegations in Complaints 2 and 3.

### Complaint 4

Defendants initiated Complaint 4 against Dr. Jensen on August 3, 2021. Compl. ¶¶149-150 & Ex. 4. The letter contained the subject line: "RE: Complaint Regarding Petition for Temporary Restraining Order Filed in U.S. District Court" and cited to "Board File No: BFA06210913." *Id.* This investigation concerned the substance of a lawsuit for a Temporary Restraining Order in which Dr. Jensen participated in the Northern District of Alabama. Compl. ¶¶152-153 & Ex. 4. It included the following language:

9

[a]ccording to the complaint, the TRO falsely claimed that children under the age of 16 'are at 0% risk of death, and that [children] are not at risk of harm from COVID-19.' The complaint further alleged that your 'attempt to use the legal system to not allow any children in the U.S. to receive this vaccination during the pandemic...is a gross breach of professional conduct and will lead to measurable harm.'

Compl. ¶153 & Ex. 4. In response to this allegation of "medical malpractice" by a nonpatient member of the public whom Dr. Jensen had almost certainly never met, Defendants demanded written responses and production of documents from Dr. Jensen "by August 27, 2021" to include the following information:

"A description of your current practice situation;"

"The current status of the TRO and/or the U.S. District Court's ruling on the matter; and"

"Any additional information that you would like the Board to consider in its review of this matter."

Compl. ¶166 & Ex. 4. In other words, Defendants initiated an investigation against Dr. Jensen because he exercised his First Amendment right to petition the government for redress of grievances. Tellingly, there is no mention of this lawsuit or the Board's ensuing investigation anywhere in Defendants' memorandum.

Dr. Jensen provided a 62-page response to the Board on August 17, 2021 under penalty of further disciplinary action if he refused to cooperate. Compl. ¶¶168-170. The Board specifically requested "a copy of the TRO and any relevant decisions filed by the U.S. District Court," which he also provided. Compl. ¶167. As part of his written response, Dr. Jensen explained that he had contacted the attorney representing the Plaintiffs in the TRO lawsuit and was no longer a named Plaintiff, but that he had submitted an affidavit in support of the Plaintiffs in that case. Compl. ¶148.

As with Complaint 2, the investigation lasted for nearly two months, and ultimately resulted in a dismissal letter on September 30, 2021. Unlike the prior investigations, however, it included the following language: "[T]he investigation may be re-opened in the future if the Board receives information that was not previously considered during the initial investigation of the complaint, or if the Board receives similar complaints or reports regarding your practice of medicine… [t]his complaint is not public, but will remain on file." Compl. ¶179.

## Complaint 5

Three weeks after the date of the dismissal notice for Complaint 5, Defendants initiated yet another investigation into Dr. Jensen. Compl. ¶184. Defendants again alleged violations of Minn. Stat. §§147.091 Subd 1(g) and (k), with specific allegations brought by members of the general public who were not patients reading as follows:

"It is alleged that you are using your position as a medical provider to *spread misinformation* regarding the COVID-19 pandemic, including 'calling for civil disobedience' among Minnesotans and businesses to ignore vaccine and mask guidance' [sic]" (emphasis added);

"It is alleged that you are not vaccinated and are putting patients at risk by not wearing masks in the patient care setting, and you are inappropriately recommending against children wearing masks in schools;"

"It is alleged that you are inappropriately 'politicizing public health' at your *campaign events*. Specifically, during a *public speech* on September 20, 2021, you reportedly stated, 'We have 19 years of data that says masks don't do the job...They have a 10% filtration rate.' Additionally, you reportedly compared the vaccines to 'chemotherapy for cancer' (emphasis added);"

"It is alleged that you are telling your 'followers' that hospitals and doctors are falsifying death certificates and changing the cause of death to COVID-19;"

"It is alleged that you are inappropriately promoting the use of ivermectin to treat COVID-19 symptoms;" and

"It is alleged that you are inappropriately promoting the benefits of natural immunity and over vaccines."

Compl. ¶¶188, 192 & Ex. 5 (emphasis added). Again, Dr. Jensen submitted a written response, again under the penalty of further sanctions for failure to comply. Compl. ¶206. As with the other Complaints, the substance of these allegations concerned solely protected political speech, including social media posts. In addition, Defendants were investigating Dr. Jensen for comments he made during a campaign speech. Compl. ¶¶194-195.

This Complaint letter included the same admonishment regarding cooperation under penalty of further sanctions by the Board. Compl. ¶206. Dr. Jensen again responded under threat of penalty for not responding. His response to this set of allegations included similar scholarly journals and medical literature to that he had produced in response to the earlier actions against him. Compl. ¶208. Despite his full cooperation with this latest investigation into his protected speech, on December 21, 2021, Defendants demanded that even *more* be produced. Compl. ¶¶210-213.

Once again, amid the rigors of a modern political campaign, and under threat of further sanctions against his license to practice medicine for refusal to cooperate with the Board's fifth investigation, Dr. Jensen complied by preparing yet another written response in January 2022 to the allegations lodged against him by his political opponents. Compl. ¶215. Unlike the other Complaints, however, this set of allegations was not dismissed.

For more than one year, and throughout the entirety of the remainder of his campaign for Governor, Complaint 5 was held open with neither any resolution nor updates as to its status. Compl. ¶216. In doing so, Defendants violated at least two provisions of

12

Minnesota law, both of which were written to prevent situations exactly like this one from occurring. Compl. ¶¶218-220. In their memorandum, Defendants fail to address this deliberate and unlawful act altogether. Each and every day for more than a year, Dr. Jensen was faced with the prospect of license suspension for espousing his viewpoints on COVID-19 and the government's response thereto. Compl. ¶224.

### Notice of Conference

By January 2023, and after Dr. Jensen had lost the election to Governor Tim Walz—the Governor who had appointed the Defendants responsible for carrying out the unlawful investigations—15 months had elapsed since the investigation into Complaint 5 was first brought to bear against him. Compl. at ¶7. The new year brought with it the "Notice of Conference," a document which realleged *all the previous Complaints against him and added five more*, some of which remain unknown to him still today. Compl. ¶¶235-245. It also demanded that he appear before a panel of Defendant Board members to answer yet again for the speech he had espoused over the prior three years. Compl. ¶¶228-233.

After retaining counsel, Dr. Jensen attended the Conference on March 24, 2023 which, as with all the other Complaints, was held pursuant to the authority claimed by the BMP in Minn. Stat. §214.103, subd. 6. The Notice stated that the "purpose of the Conference [was] to discuss [Dr. Jensen's] ability to practice medicine and surgery with reasonable skill and safety to patients." Compl. ¶230 & Ex. 6. As with the other Complaints, a written response was "requested" under penalty of "failure to cooperate under Minnesota Statutes sections [sic] 147.131 (2020)." Compl. Ex. 6.

The "Conference" held by BMP under section 214.103, subdivision 6 is not compliant with the Administrative Procedure Act, which would require a "Contested Hearing" outlined in section 214.103, subdivision 7. Compl. ¶¶44, 251. Dr. Jensen had extremely limited due process protections, and had no ability to request and obtain information about the frivolous allegations against him for his speech. After the Conference had concluded, the Board dismissed the allegations in the "18" complaints it had received regarding Dr. Jensen's speech over the preceding years.[3]

### The Board Continues to Claim Jurisdiction Over Dr. Jensen's Speech

As the three years' worth of pretextual investigations demonstrate, Plaintiff was targeted for his political speech. Yet, today, Defendants *still claim* in their Memorandum their claimed authority over *all* the public speech espoused by Dr. Jensen:

> Plaintiff's prior conduct, including that involving *commentary* on matters of public health such as the efficacy of COVID-19 vaccines for children, and *commentary* on the practice of medicine such as the guidance issued by the Minnesota Department of Health for recording COVID-19 on death certificates, was properly subject to the complaint review and resolution process required of all health-related licensing boards under Minnesota Statutes section 214.103.

Defs.' Mem. 21-22 (emphasis added). Instead of acknowledging and agreeing that Defendants have no jurisdiction over doctors' speech on matters of public concern and outside the context of a doctor-patient relationship, Defendants have doubled down and vigorously defended their actions.

---

[3] As alleged at paragraph 245 of the Complaint, there are at least two and as many as five complaints of which Dr. Jensen was never made aware.

## ARGUMENT

The First Amendment forbids a licensing board and its members from initiating investigation after investigation into a licensee based purely on the licensee's protected political speech. That is what happened here—the Defendants used their investigatory powers to put pressure on Dr. Jensen's license and force him to divert his time and resources into responding to frivolous complaints. Defendants made the process into Dr. Jensen's punishment. That punishment chilled Dr. Jensen's speech and continues to linger over him like the mythical Sword of Damocles, continuing its chilling effect.

Thus, at its core, this case is about the difference between First Amendment protected political speech and professional conduct subject to regulation. This critical distinction is the difference between legitimate regulation of the practice of medicine on one hand, and violations of a licensee's constitutional rights on the other. Tellingly, in their memorandum in support of dismissal, the Defendants do not wrestle with this question at all. Instead, they paint with an extremely broad brush, conflating their latest-in-time investigation of Dr. Jensen's prescription of "off-label"[4] medication in the January 25,

---

[4] "Off-label" prescription is the prescription of a drug approved by the FDA for one use, and then prescribed for another. As the FDA says it: "once the FDA approves a drug, healthcare providers generally may prescribe the drug for an unapproved use when they judge that it is medically appropriate for their patient." *Understanding Unapproved Use of Approved Drugs "Off Label,"* U.S. FDA, Feb. 5, 2018, *available at* https://www.fda.gov/patients/learn-about-expanded-access-and-other-treatment-options/understanding-unapproved-use-approved-drugs-label.

2023 Notice of Conference,[5] with their investigations and demands beginning in 2020 that he answer for "spreading misinformation[6] on a regional TV station,"[7] or posting Facebook videos,[8] being an undefined and vague "danger to public health,"[9] participating in a lawsuit in a different state,[10] or "politicizing public health"[11] during a campaign speech.

Defendants made eighteen separate decisions to arrogate to themselves jurisdiction over this speech, and thus try to assume control of Dr. Jensen's political narrative, using the power of investigation and penalties threatened for failure to comply with investigation. Compl. ¶5. Defendants offer only the pretextual excuse that they were mechanically "fulfilling their statutory duty to receive and resolve complaints,"[12] without addressing whether they had to determine their jurisdiction before using their powers of investigation. Defendants used their powers under Minn. Stat. §214.103, subd. 6, which only apply to the

---

[5] Compl. Ex. 6. Notably, this Board action only came about as a result of the initial illegal investigation into his public statement that he was "inappropriately promoting the use of Ivermectin to treat COVID-19 symptoms," which is itself protected speech. *Id.*

[6] "Misinformation" is not defined in the Medical Practice Act, or anywhere else in Minnesota Statutes for that matter. But even if misinformation were defined, it would be protected by the First Amendment and not subject to regulation by the Board of Medical Practice unless incident to a medical procedure. *See Nat'l Inst. of Family & Life Advocates v. Becerra,* 138 S. Ct. 2361 (2018) ("*NIFLA*").

[7] Compl. Ex. 1.

[8] Compl. Ex. 2.

[9] *Id.*

[10] Compl. Ex. 4.

[11] Compl. Ex. 5.

[12] *See, e.g.*, Defs.' Mem. 3, 4, 5, 13, 18, 22, 24, 26.

practice of medicine, as a weapon to retaliate against Dr. Jensen for his speech and viewpoints, and to chill him and other physicians from speaking further on the subject.

Qualified immunity is not a refuge for Defendants, either. The well-settled, controlling legal authorities at the time of Defendants' violations included the First Amendment, a Supreme Court decision directly on point, and a long line of precedent refusing to recognize professional speech as a separate category subject to different scrutiny. Any competent public official charged with the regulation of the practice of medicine knew or should have known they cannot use investigatory power to launch an inquisition into political speech.

Finally, Defendants argue that Dr. Jensen lacks standing because "he has not alleged a sufficient injury in fact with a direct causal connection" to Defendants' actions, and there is no currently pending investigation. Defs.' Mem. 20-21. Defendants assert that the claims before the Court are moot on these same grounds. *Id.* at 25. None of these arguments has any legal merit; there is no question that Dr. Jensen has standing for his claims for retrospective damages, and he has also adequately alleged an ongoing objective chill to his speech consistent with Eighth Circuit precedent. Accordingly, the Court should reject Defendants' motion to dismiss in its entirety.

## I.   LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the…claim is and the grounds upon which it rests," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Also, the Court may only grant a motion to dismiss

for failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6) if the Complaint, taken as a whole, lacks "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal marks omitted).

A claim only lacks "facial plausibility" when the plaintiff fails to plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Importantly, assuming the truth of the Complaint's allegations here, the Court must take all reasonable inferences in Plaintiff's favor. *Zayed v. Associated Bank, N.A.*, 779 F.3d 727, 730 (8th Cir. 2015). In addition, "[r]equiring a plaintiff to rule out every possible lawful explanation for the conduct he challenges would invert the principle that the 'complaint is construed most favorably to the nonmoving party,' and would impose the sort of 'probability requirement' at the pleading stage which *Iqbal* and *Twombly* explicitly reject." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 597 (8th Cir. 2009) (internal citations omitted). Defendants attack the Complaint under Rule 12(b)(6), so the Court should apply this standard to this motion.

## II. DEFENDANTS RETALIATED AGAINST DR. JENSEN BASED ON HIS VIEWPOINT.

Throughout the pendency of the six actions against Dr. Jensen, his message was consistent: he vocally disagreed with the government's handling of the COVID-19 virus and the government narrative about the far-from-settled "science" in the area. Compl. ¶¶69, 127, 146, 171, 218 & Exs. 1-6. For this speech, and specifically for these viewpoints, Defendants targeted Dr. Jensen for investigation. Defendants' extra-jurisdictional acts

would certainly chill a person of ordinary firmness from continuing to speak. The Board and its members put Dr. Jensen in a nearly impossible situation, and it took remarkable courage to persist in his speech in the face of looming discipline and abuse-of-process by Defendants.[13]

"The First Amendment protects the right of an individual to speak freely, to advocate ideas, to associate with others, and to petition his government for redress of grievances." *Smith v. Ark. State Highway Emps.*, 441 U.S. 463, 464 (1979); *see also NIFLA*, 138 S. Ct. at 2371. Further, "[t]he government is prohibited from infringing upon these guarantees either by a general prohibition against certain forms of advocacy, or by imposing sanctions for the expression of particular views it opposes." *Id.* Further, "[c]riticism of public officials lies at the very core of speech protected by the First Amendment."

*Green v. City of St. Louis*, 52 F.4th 734, 739 (8th Cir. 2022) (internal quotation marks omitted). Laws or government actions that target speech based on its content are presumptively unconstitutional. *NIFLA*, 138 S. Ct. at 2371.

Retaliation by a government actor in response to such an exercise of First Amendment rights forms a basis for §1983 liability. *Pendleton v. St. Louis County*, 178 F.3d 1007, 1011 (8th Cir. 1999); *see also Naucke v. City of Park Hills*, 284 F.3d 923, 927-

---

[13] The Court should not fall for the straw-man argument presented by Defendants on pages 23-24 of their Memorandum. Plaintiff does not allege that he was harmed by the Board publicly disclosing the investigations, and Defendants do not point to any examples in the Complaint to support this contention.

28 (8th Cir. 2002). To establish a claim for retaliation under §1983, a plaintiff must show "she was engaged in constitutionally protected activity, that [the government official's] adverse action caused her to suffer an injury which would 'chill a person of ordinary firmness from continuing…in that activity,' and that the adverse action was motivated in part by…exercise of her constitutional rights." *Naucke*, 284 F.3d at 927-28 (quoting *Carroll v. Pfeffer*, 262 F.3d 847, 850 (8th Cir. 2001)). "This is an objective test: [t]he question is not whether the plaintiff [him]self was deterred, though how plaintiff acted might be evidence of what a reasonable person would have done." *Eggenberger v. W. Albany Twp.*, 820 F.3d 938, 943 (8th Cir. 2016) (internal quotation marks omitted).

Plaintiff easily pleaded a plausible claim for First-Amendment retaliation in the Complaint.

## A.  Dr. Jensen engaged in First-Amendment-protected speech about COVID-19 and the government response thereto.

The Complaint plainly alleges that Dr. Jensen spoke publicly about matters of public concern, including criticism of the government, repeatedly over a 32-month span between 2020 and 2023. Compl. ¶¶69, 127, 146, 171, 218 & Exs. 1-6.

He appeared on national television and spoke out against a Minnesota Department of Health advisory as to how to certify deaths related to COVID-19 in April 2020. Compl. ¶68-69. He announced that he was running for Governor of Minnesota in March 2021, largely based on his public advocacy related to COVID-19 and criticism of the government's response to it over the prior year. Compl. ¶¶127-128. In September 2021, he publicly challenged the wisdom of an executive order at the federal level which threatened

to compel 100 million Americans to be vaccinated for COVID-19. Compl. ¶171. He also made numerous comments critical of Defendants in particular. Compl. ¶218. He engaged in core political speech by taking part in a lawsuit related to COVID-19 policies in a federal district court. Compl. ¶259. Thus, he engaged in core political speech on matters of substantial public concern, which is at the zenith of First Amendment protections. *Calzone v. Summers*, 942 F.3d 415, 427 (8th Cir. 2019); *Meyer v. Grant*, 486 U.S. 414, 425 (1988).

Defendants fail to explain how any of the allegations in the complaints constitute the practice of medicine, rather than expressions of core political speech. Nor could they, because case law overwhelmingly demonstrates that Plaintiff's speech is protected by the First Amendment. Defendants, incredibly, insist that Dr. Jensen's speech was subject to their regulation. Defs.' Mem. 21-22. While the law on this issue has been clearly established for decades, the Supreme Court emphatically reaffirmed that agencies cannot regulate professionals' political speech in *NIFLA*. 138 S. Ct. 2361 (2018). *NIFLA* is the seminal case which defines the line between speech and professional conduct:

> But this Court has not recognized "professional speech" as a separate category of speech. Speech is not unprotected merely because it is uttered by "professionals."
> ….
> This Court has afforded less protection for professional speech in two circumstances—neither of which turned on the fact that professionals were speaking. First, our precedents have applied more deferential review to some laws that require professionals to disclose factual, noncontroversial information in their "commercial speech."….Second, under our precedents, States may regulate professional conduct, even though that conduct incidentally involves speech.

*NIFLA*, 138 S. Ct. at 2371-72.

None of Dr. Jensen's statements investigated by Defendants, which investigations forced Dr. Jensen to respond and put him in fear of losing his license, had anything to do with "professional conduct," as Defendants claim. And "The government cannot regulate speech by relabeling it as conduct." *Otto v. City of Boca Raton*, 981 F.3d 854, 865 (11th Cir. 2020) (applying *NIFLA*). The *NIFLA* Court actually explained that for a statement to be "professional conduct" which only incidentally burdens speech in the medical field, it must relate to a specific "doctor-patient" relationship, such as in the context of a "medical procedure….sought, offered, or performed." 138 S. Ct. at 2373-74.

This case is very similar to *NIFLA*. Here, as in *NIFLA*, government officials have sought to regulate the content of a physician's speech. Defendants argue that the dispute in *NIFLA* involved compelled speech by a government entity rather than retaliation for or deprivation of protected speech. *See* Defs.' Mem. 19. This is a distinction without a difference. The government can neither compel speech, as in *NIFLA*, nor prohibit or punish speech, as here. *See Otto*, 981 F.3d at 859 (striking down as violative of the First Amendment a municipal ordinance which prohibited therapists from "engaging in counseling…with a goal of changing a minor's sexual orientation"). *NIFLA* and its progeny define the line between speech and professional conduct and makes clear that none of Dr. Jensen's comments in any of the Complaints were subject to regulation by Defendants.

Attempting to counter the obvious protections for Dr. Jensen's political speech laid out in *NIFLA*, Defendants assert that, "[c]ontrary to Plaintiff's claim, *NIFLA* does not stand for the proposition that any *public speech* involving the practice of medicine, but not tied directly to the act of caring for a specific patient, is outside the reach of a licensing board's

ability to investigate or regulate a licensee's conduct. Defs.' Mem. 19-20 (emphasis added).

Unless that "public speech" is directly tied to an actual doctor-patient relationship, then

*NIFLA* means exactly what Dr. Jensen says it means: "a State may not, under the guise of

prohibiting professional misconduct, ignore constitutional rights." *NAACP v. Button*, 371

U.S. 415, 439 (1963) (quoted approvingly by *NIFLA*, 138 S. Ct at 2373).

     *NIFLA* even provided guidelines and examples for determining what is professional

speech in the medical field. As noted above, for a statement to be "professional conduct"

which only incidentally burdens speech in the medical field, it must relate to a specific

"doctor-patient" relationship, such as in the context of a "medical procedure….sought,

offered, or performed." 138 S. Ct. at 2373-74. *NIFLA* also used a counterexample from

*Planned Parenthood of Southeastern Pa.* v. *Casey,* 505 U.S. 833, 884 (1992). In that case,

"Pennsylvania law required physicians to inform their patients of the nature of the

procedure, the health risks of the abortion and childbirth, and the probable gestational age

of the unborn child." *NIFLA*, 138 S. Ct. at 2373 (quoting *Casey*, 505 U.S. at 881) (internal

quotation marks omitted). *Casey* rejected the challenge to the statute and permitted

regulation of the speech, explaining that, "for constitutional purposes, [it was] no different

from a requirement that a doctor give certain specific information about any medical

procedure." *Id.* (quoting *Casey*, 505 U.S. at 884). As the *NIFLA* Court reasoned: "the

requirement that a doctor obtain informed consent to perform an operation is firmly

entrenched in American tort law." *Id.* (internal quotation marks and citations omitted).

     The statements made by Dr. Jensen simply do not relate to any "practice" of

medicine. None of the complaints related to a patient relationship or specific patient advice,

and any person who heard Dr. Jensen speak publicly would then have to go see their own doctor and discuss and decide on any medical procedures. Again, Defendants do not grapple with this distinction. This is because Dr. Jensen repeatedly was engaged in and investigated for pure speech, protected by the First Amendment, and not subject to regulation. *See* Compl. Exs. 1-6.

There are good policy reasons why government actors like Defendants cannot regulate professionals' political speech, or even speech simply related to unpopular beliefs about medicine:

> [T]his Court has stressed the danger of content-based regulations "in the fields of medicine and public health, where information can save lives."
> ….
> Take medicine, for example. "Doctors help patients make deeply personal decisions, and their candor is crucial. Throughout history, governments have "manipulat[ed] the content of doctor-patient discourse" to increase state power and suppress minorities…"

*NIFLA*, 138 S. Ct. at 2374 (internal citations and quotation marks omitted).

The Court went on to provide examples of this abuse in communist China, the former Soviet Union, and Nazi Germany. *Id.* These examples of government regulation of speech in the medical field by some of the most oppressive regimes in human history are examples of the end of the path on which government officials embark when they punish free speech in the name of "regulating professional conduct." Defendants cannot justify their content-based restrictions on Dr. Jensen's speech by virtue of the fact that he is a physician; to the contrary, such speech is entitled to the highest protections afforded by the Constitution.

### B.  Defendants took adverse action against Dr. Jensen which would chill a person of ordinary firmness from making similar speech.

Defendants only briefly argue that their action against Dr. Jensen was not "adverse." They claim that it was not adverse because Defendants only "follow[ed] the statutory complaint resolution process," and there is "no pending complaint before the Board or ongoing investigation which could result in adverse action against Plaintiff's license." Defs.' Mem. 21. Defendants simply fail to appreciate the standard, at the Rule 12 stage, of what allegations are required to establish adversity. As the Seventh Circuit put it succinctly, "the law merely requires some negative consequence (deprivation) with a chilling effect on First Amendment activity. *FKFJ, Inc. v. Vill. of Worth*, 11 F.4th 574, 585 (7th Cir. 2021).

Furthermore, as the Supreme Court has held, [s]ome adverse actions may be easy to identify—an arrest, a prosecution, or a dismissal from government employment." *Hous. Cmty. Coll. Sys. v. Wilson*, 142 S. Ct. 1253, 1260 (2022). In that regard, Plaintiff has alleged enough by simply alleging the existence of the investigation, which is akin to a prosecution, and which threatened his livelihood. Compl. Exs. 1-6. But if that isn't enough, to "distinguish material from immaterial adverse actions, lower courts have….asked whether the government's challenged conduct would 'chill a person of ordinary firmness' in the plaintiff's position from engaging in 'future First Amendment activity,'" or "whether a retaliatory action 'adversely affected the plaintiff's…protected speech,' taking into account things like the relationship between the speaker and

retaliator and the nature of the government action in question." *Wilson*, 142 S. Ct. at 1260.

Under any of these lenses, Dr. Jensen adequately alleged that Defendants' investigations chilled his speech and would certainly chill the speech of any person of ordinary firmness:

> Dr. Jensen was forced to pursue nearly his entire campaign for Governor of Minnesota under a cloud of constant uncertainty, not knowing which public statements would be selected by the BMP as tools to chill his speech. Thousands of hours were expended answering the Board's various "requests" to respond to impossibly vague allegations that the Medical Practice Act was violated, which were made under penalty of additional violations against his license for refusal to cooperate.

Compl. ¶6. In fact, Dr. Jensen even *told* the Defendants that they were chilling his speech as they investigated him repeatedly and kept doing it:

> In his email to Mr. Anderson, Dr. Jensen also stated, "I am compelled to share with you that this anonymous complaint accusing me of being a 'danger to public health' has an ongoing chilling and suppressing effect on my ability to candidly and honestly share my perspective and thoughts with patients and constituents."

Compl. ¶122. It is hard to imagine clearer allegations of subjective and objective chill. And Eighth Circuit precedent coheres with Plaintiff's view of what chill is required to demonstrate adverse action. "Reasonable chill exists when a plaintiff shows 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by [the] statute, and there exists a credible threat of prosecution.'" *281 CARE Committee v. Arneson*, 766 F.3d 774 (8th Cir.2014) (internal citations omitted). Under these facts, Dr. Jensen amply alleged that the Board's actions were intended to chill his speech, that the statute in question

26

was unconstitutional, and that he was chilled by the Board's actions against him. *See* Compl. at ¶¶6, 217, 218, 224, 225, 255, 265, 268, 269, 280, 289.

In an attempt to counter this, Defendants argue that, because Dr. Jensen actually spoke and the effort to silence him was not entirely successful, any chilling effect caused by the six illegal investigations would not be "objectively reasonable." Defs.' Mem. 22. But, as Defendants admit, the standard is whether the "adverse action taken against him would 'chill a person of ordinary firmness' from continuing to speak…" *Scheffler v. Molin*, 743 F.3d 619, 621 (8th Cir. 2014).

A "person of ordinary firmness" would not have been able to withstand what Dr. Jensen was subjected to. As alleged in the Complaint, Dr. Jensen was forced to pursue nearly his entire campaign for Governor under a cloud of constant uncertainty, not knowing which public statements would be selected by the BMP as tools to chill his speech. Compl. ¶¶6, 8. And, as discussed more below related to mootness, nothing has changed with Minn. Stat. §147.091, subd. 1(g), which is unconstitutionally vague and sweeps vast swathes of protected speech into its ambit, as this case shows. The ordinary person, after 40 years of the practice of medicine without an investigation, followed by a sudden series of investigations based on speech alone, combined with the stress inherent in a modern political campaign, would have been chilled from exercising his First Amendment rights.

**C. Defendants' investigations were motivated entirely by Plaintiff's exercise of his First Amendment rights.**

Defendants claim that there is no causal connection between their actions and the First Amendment violations described in the Complaint. Defs.' Mem. 20, 24 ("Any purported injuries Plaintiff alleges are not traceable to the Board, which was fulfilling its statutory duty…"). But each of the unlawful, extra jurisdictional investigations into Dr. Jensen plainly took place as a direct result of his speech. And there are substantial allegations of bad faith in the Complaint. Defendants investigated Dr. Jensen with the intent to retaliate against Dr. Jensen for his speech.

The causal connection between an illegal government action and espoused speech is strengthened by proof that defendants' given reasons for their adverse actions were unfounded. *Hudson v. Norris*, 227 F.3d 1047, 1051-52 (8th Cir. 2000). In addition, the finder of fact may infer an improper motive from evidence of the falseness of the government's proffered justification for an adverse action. *Id.* (citing *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000)). The Eighth Circuit has also held that a plaintiff's "exemplary" record, in combination with the fact that the adverse government action took place in temporal proximity of the protected activity, was sufficient to allow "a reasonable jury to infer a causal link between [the two]." *Davison v. City of Minneapolis, Minn*, 490 F.3d 648, 657 (8th Cir. 2007) (quoting *Hudson*, 227 F.3d at 1051, 1053). An adverse action that occurs "on the heels of protected activity 'is significant evidence that what happened…was more than just coincidence.'" *Id.* (quoting *Hudson*, 227 F.3d at 1051); *see also Stever v. Independent School District No. 625*, 943 F.2d 845, 852 (8th Cir. 1991) ("the order and temporal proximity of [the challenged government action and the

protected activity] should not be regarded as coincidental on a motion for summary judgment").

All of these indicators, as thoroughly alleged in the Complaint, are present here. First, as Plaintiff has shown above, the investigations were unfounded because they centered on pure political speech. Second, as the Complaint also demonstrates, each of the complaints closely followed Dr. Jensen's political statements, temporally. And the complaints themselves directly state that they are in response to Dr. Jensen's speech. Third, in his 40 years of practicing medicine, Dr. Jensen had never once been investigated by the Board of Medical Practice prior to the Spring of 2020. Compl. ¶1. While all the complaints came in direct response to his speech, complaint 5 is especially suspect because of its duration and timing, which spanned more than a year. Defendants even violated two statutes in order to prevent a speedy resolution to the fifth complaint prior to the 2022 election. Compl. ¶¶219, 220. This deliberate act enabled Defendants to keep their illegal investigation open during the entirety of the final year of Dr. Jensen's campaign for Minnesota Governor. All these factors militate in favor of a finding of retaliation and bad faith.

Defendants' proffered justification—that they were just "following the process," is simply bogus. Perhaps most destructive to Defendants' process argument is the fact that complaint 3 was *dismissed without a request for response* from Plaintiff. Compl. Ex. 3. Defendants knew that they could do exactly that for each of the complaints, and they intentionally chose to force Dr. Jensen to explain his political speech, devoting his personal time and distracting from his campaign. Further, none of the complaints contains language

suggesting that the Board was trying to determine whether it had jurisdiction. Dr. Jensen was never asked whether the allegations involved patient care or any other element of the practice of medicine over which the BMP has jurisdiction. Instead, the Board simply demanded written answers to hostile public comments on his political speech. *See* Compl. Exs. 1-6. And the fifth complaint, which realleged all the prior complaints against Plaintiff a second time in the Notice of Conference, obliterates the excuse of "seeking to determine whether it had jurisdiction." By the fifth complaint, Defendants not only had more time to consider their jurisdiction, but they also had Dr. Jensen's prior responses defending his speech. And they had Dr. Jensen's stated concern that the investigations were chilling his speech.

Further, as Defendants admit, Minn. Stat. §214.103 Subd. 1a(b) requires that the BMP notify a licensee within 60 days of the receipt of a complaint against him, its substance, and whether an investigation is being conducted. *See* Defs.' Mem. 5 n2. Defendants claim they were "performing their statutory duty" in "receiving and resolving 18 complaints about Plaintiff that were submitted to the Board between April 2020 and *June 2022*." Defs.' Mem.' 4 (emphasis added); *see also* Compl. Ex. 6. However, there was no communication between the Board and Dr. Jensen between January 2022, and January 2023. Compl. ¶¶216, 217 & Ex. 6. This means that, even if the complaint(s) received in June 2022 actually concerned conduct subject to regulation unlike all the rest, Defendants violated subdivision 1a(b) by failing to disclose their existence—all during the final year of a campaign for Governor.

30

Finally, Defendants fail to explain why they violated their own social-media policy in investigating Dr. Jensen. Defendant Martinez twice stated flatly and unambiguously that "Social Media for us as a Board is not something that we rely upon in our investigative process." Compl. ¶55. Yet the complaints directly refer to social media posts as bases for investigation. Compl. Exs. 1-6.

There is an abundance of circumstantial evidence giving rise to easy inferences that Defendants used their process as punishment for Dr. Jensen's speech. Dr. Jensen has stated a claim for violation of his First Amendment rights.

### III.  MINNESOTA LAW AUTHORIZES INVESTIGATIONS INTO MEDICAL PROFESSIONALS' PURE SPEECH IN VIOLATION OF THE FIRST AMENDMENT.

Minnesota Statutes section 147.091, subdivision 1(g)(1) and (2) are facially unconstitutional as content-based regulations of speech, and their existence, coupled with Defendants' actions alleged in this case, demonstrate an ongoing objective chill of Plaintiff's political speech. The law provides that the BMP may impose disciplinary action on a licensee for:

> (g) Engaging in any unethical or improper conduct, including but not limited to:
>
> (1) conduct likely to deceive or defraud the public;
>
> (2) conduct likely to harm the public.

These provisions, which were the animating force behind almost all of Defendants' investigations, target a substantial amount of speech. They are content-based restrictions and presumptively invalid: it is hard to imagine what "deceptive" or "defrauding"

"conduct" would not be determined by reference to what someone says. *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). And as noted above, the government cannot simply call speech "conduct" to justify its laws governing expression. *Otto*, 981 F.3d at 865 (applying *NIFLA*). Neither can a statute claiming to govern conduct be so overbroad that it "prohibits a substantial amount of protected speech." *United States v. Williams*, 553 U.S. 285, 292 (2008). A statute's overbreadth must be "substantial" "not only in an absolute sense, but also relative to the statute's plainly legitimate sweep." *Id*. And finally, these provisions are also unconstitutionally vague. They "fail[] to give ordinary people fair notice of the conduct [they] punish[], or so standardless that [they] invite[] arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015). When "the law interferes with the right of free speech or of association, a more stringent vagueness test should apply." *Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 499 (1982). As Plaintiff's case illustrates, subdivision 1(g) subjects core First Amendment protected speech, speech concerning "politics…or other matters of opinion," *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943), to Defendants' investigatory powers.

## A. Subdivisions 1(g)(1) and (2) are unconstitutionally overbroad.

The first step in the overbreadth analysis is to construe what the statute covers. *Id*. at 293. Despite the law's use of the term "conduct," Defendants' multiple investigations of Plaintiff demonstrate that subdivision 1(g) does in fact target speech: nearly all of the allegations that Defendants investigated concerned public speech, completely divorced from the conduct-with-incidental-speech that the Defendants are constitutionally allowed

to regulate per *NIFLA*. *See, e.g.,* Compl. ¶¶72, 76, 81-83, 100, 102, 105-108, 133, 136-139, 150, 152-153, 156, 159.

After all, the statute itself claims to target "conduct likely to deceive or defraud *the public*" or "likely to harm *the public*"—these targets are necessarily out of bounds for regulation because a medical professional does not practice medicine on the public, only on individual patients, and so any speech falling under those provisions is necessarily non-incidental. Moreover, the speech subject to disciplinary action under the law is completely divorced from the conduct the Supreme Court has suggested is the proper purview of professional regulation. *See NIFLA*, 138 S. Ct. at 2373. For this reason, subdivision 1(g) is overbroad and, at the same time, gives rise to a chilling effect by its vagueness. And also for this reason, there is no government interest supporting the law because it targets so much political speech.

**B.  Subdivisions 1(g)(1) and (2) are unconstitutionally vague.**

First, Minn. Stat. §147.091, subd. 1(g) does not give adequate notice of the conduct it seeks to punish. Specifically, 1(g)(1) and (2) employ the term "conduct" unmoored from the context of medical practice, rendering them vague as to what might trigger them. It is impossible to predict what would "likely" to "deceive" or "harm" the public, even discourse concerning health-related matters whose facts and data are unfolding in real time. Exacerbating its vagueness, the statute contains no scienter requirement, so a licensee is susceptible to being investigated and disciplined without even having intended to cause any of the effects the law enumerates—indeed, for just expressing his opinion on a matter

of public and/or scientific debate. *Colautti v. Franklin*, 439 U.S. 379, 395 (1979) ("This Court has long recognized that the constitutionality of a vague statutory standard is closely related to whether that standard incorporates a requirement of mens rea.")).

Second, the unpredictability of what speech could "likely" "deceive" or "harm" the public also goes to the arbitrariness of its enforcement. The Supreme Court has explicitly stated that "the more important aspect of the vagueness doctrine" is its guard against arbitrary enforcement by those who would use a law's "standardless sweep" to "pursue their personal predilections." *Kolender v. Lawson*, 461 U.S. 352, 358 (1983) (internal citations omitted). Since subdivision 1(g) sweeps in core protected speech, it is highly problematic that the law uses "likely" as a descriptor. Moreover, what might constitute "deception" in the realm of political discourse, or especially discourse concerning ever-changing information on a nascent, mutating pathogen, can be hotly disputed. Furthermore, as shown above under Plaintiff's overbreadth analysis, the fact that anyone may file a complaint—which, according to Defendants, statutorily must be investigated, Defs.' Mem. 13—means that anyone can abuse this standard, including political opponents of the licensee, to pursue their personal predilections. The Eighth Circuit has identified this as "immensely problematic." *281 Care Comm. v. Arneson,* 766 F.3d 774, 792 (8th Cir. 2014) (emphasis original).

Thus, Minn. Stat. §147.091, subd. 1(g)(1) and (2) are void for vagueness because they fail to provide notice of when non-incidental speech may trigger investigation and/or disciplinary action and because they invite arbitrary investigation of speech, which, per *NIFLA*, the First Amendment prohibits.

34

**C. Subdivision 1(k) is unconstitutional as-applied.**

Subdivision 1(k) of the same statute, which allows discipline for "[c]onduct that departs from or fails to conform to the minimal standards of acceptable and prevailing medical practice in which case proof of actual injury need not be established," is also unconstitutional as applied to Dr. Jensen for the same reasons that subdivision 1(g) is facially unconstitutional: as the complaints show, Defendants only invoked subdivision 1(k) pretextually to target Dr. Jensen's speech.

Minn. Stat. §147.091, subds. 1(g) and (k) are facially unconstitutional and unconstitutional as-applied, respectively, and the Court should deny Defendants' motion to dismiss Plaintiff's claim for declaratory and injunctive relief premised on the chilling effect created by those statutes.

## IV.  QUALIFIED IMMUNITY DOES NOT PROTECT THE INDIVIDUAL-CAPACITY DEFENDANTS

The individual-capacity Defendants claim they are immune from a suit for damages under the doctrine of qualified immunity. Not so.

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982). Whether an official may prevail in his qualified immunity defense depends upon the "objective reasonableness of

35

[his] conduct as measured by reference to clearly established law." *Davis v. Scherer*, 468 U.S. 183, 191 (1984) (internal citations omitted). "Once a court determines that the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing [the official's] conduct." *Harlow*, 457 U.S. at 818-19 (internal citations omitted).

Defendants' qualified immunity defense fails. First, Defendants were not "performing a discretionary function" when they assumed authority over Dr. Jensen's speech 18 times over nearly three years. In fact, the Board had a non-discretionary duty to evaluate the allegations as they came in, and to immediately dismiss without "investigation" those which implicated his First Amendment protected speech. Plaintiff in his Complaint has exhaustively pleaded the First Amendment violations and reiterated them here. The only remaining question is whether the rights violated by Defendants were "clearly established," which they plainly were.

"The right to be free from retaliation is clearly established as a first amendment right." *Burton v. Martin*, 737 F.3d 1219, 1237 (8th Cir. 2013) (internal quotation omitted). Further, *NIFLA*, which controls here, involved the regulation of physician speech in particular and was decided by the US Supreme Court in 2018, just two years before the first unlawful investigation was launched. As described in detail above, the Supreme Court held that professional speech can only be regulated if incidental to conduct, which only occurs in the doctor-patient context, as opposed to public speaking. *NIFLA*, 138 S. Ct. at 2373-74. As alleged here, Defendants explicitly targeted Plaintiff's speech. Compl. Exs. 1-6. As an executive branch agency tasked with regulating the practice of medicine for

physicians across the state of Minnesota, the Defendants should certainly have known that their power to investigate licensees based on political speech is unlawful. In the words of the NIFLA Court: "[A] State may not, under the guise of prohibiting professional misconduct, ignore constitutional rights. While drawing the line between speech and conduct can be difficult, this Court's precedents have long drawn it, and the line is "'long familiar to the bar[.]'" *NIFLA at* 2373 (2018).

The individual-capacity Defendants are not immune under the doctrine of qualified immunity.

### V.   DEFENDANTS' STANDING AND MOOTNESS ARGUMENTS FAIL

Defendants' standing attack as to Plaintiff's claims for retrospective relief relies only on their arguments that Dr. Jensen's speech was not chilled, which Plaintiff addresses above, particularly in section II.B. Plaintiff incorporates his arguments related to objective chill here. Defendants also argue that Plaintiff's injury is not fairly traceable to their actions, and not redressable. But Defendant is forced to admit that Plaintiff alleged that *Defendants'* investigation caused him to expend unnecessary time and money, distracted from his campaign for Governor, and chilled his speech. Defs.' Mem. 24. Everything alleged in the Complaint is traceable to Defendants. And an award of money damages, which the Complaint seeks, is an easy redress for Plaintiff's retrospective claims. Compl., Prayer for Relief, ¶¶ B & D.

As to prospective relief, Plaintiff has standing to bring his claims under the theory that sections 147.091, subdivisions 1(g) and (k) present an ongoing credible threat of

prosecution for Dr. Jensen's speech related to matters of public concern, including

COVID-19. The Eighth Circuit, in a very similar situation, has held that plaintiffs'

allegations of "reasonable worry that state officials and other complainants—including

their political opponents who are free to file complaints under the statute—will interpret

[their] actions as violating the statute," sufficient to confer standing on a plaintiff in a

First Amendment pre-enforcement challenge. *281 Care Comm. v. Arneson*, 638 F.3d 621,

630 (8th Cir. 2011). In that case, the plaintiffs alleged that Minn. Stat. § 211B.06, which

created civil and criminal penalties to make a false statement about the effect of a ballot

question, chilled their speech. *Id.* at 625-26. There was no pending prosecution against

them, and the county attorneys even argued that the statute was rarely invoked. *Id.* at 628.

Yet there was still a reasonable fear of prosecution, and thus standing, because of the

"reasonable worry" created, as discussed above.

Here, Dr. Jensen has alleged both a past and ongoing chill of his speech because of

the constant threat of prosecution imposed by section 147.091 and Defendants'

"investigatory power." Compl. ¶¶122, 315. In addition, the nature of the statute and the

history of investigation into Dr. Jensen for speaking his mind, which continues to date, as

Minnesotans read about in the news on a frequent basis, demonstrate that Dr. Jensen has

standing to sue Defendants for prospective relief.

Defendants' mootness arguments likewise fail. It is axiomatic that there is no

application of the mootness doctrine possible for claims for retrospective relief. *E.g.,*

*Straw v. Utah*, No. 23-4036, 2023 U.S. App. LEXIS 16152, at *8 (10th Cir. June 27,

2023) (plaintiffs who show actual injury from a constitutional violation may recover

damages under 42 U.S.C. § 1983). Defendants' mootness argument is frivolous if directed at past damages. As for prospective relief, Defendants' argument is bound up in their standing argument already addressed.

## VI. SOVEREIGN IMMUNITY DOES NOT APPLY TO THE OFFICIAL-CAPACITY DEFENDANTS FOR PLAINTIFF'S CLAIMS FOR PROSPECTIVE RELIEF

Defendants argue that the doctrine of sovereign immunity bars Plaintiff's claims against the Board and its members acting in their official capacities because the State of Minnesota has not consented to suit for the underlying claims and because the Supreme Court has interpreted Section 1983 as not abrogating state sovereign immunity. *See* Defs.' Mem. 10-11. Further, Defendants argue that the exception to this doctrine for prospective relief articulated in *Ex parte Young*, 209 U.S. 123 (1908), does not apply here. Defs.' Mem. 11-14.

Plaintiff concedes that precedent concerning the doctrine of sovereign immunity, the Eleventh Amendment, and Section 1983 requires this Court to dismiss Plaintiff's actions against the Board. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 65 (1989). Likewise, Plaintiff concedes that under current law, the suit must be dismissed as to the official-capacity Defendants as to the claims against them for retrospective relief. *See Edelman v. Jordan*, 415 U.S. 651, 663 (1974). However, Plaintiff believes these cases and others holding accordingly were wrongly decided and ought to be reconsidered by the Supreme Court, and he therefore wishes to preserve his arguments for appeal.

As for the applicability of the *Ex parte Young* exception for Plaintiff's claim for injunctive relief, the Defendants' analysis is incorrect; Plaintiff has satisfactorily pleaded the requirements of that exception. Below, Plaintiff first addresses the matter of *Ex parte Young* and then briefly outlines his arguments for reconsidering the applicability of Section 1983.

## A. Plaintiff's pleadings meet the requirements for prospective relief outlined in *Ex parte Young*.

The Defendants contend that the *Ex parte Young* exception does not apply to Plaintiff's claim for prospective relief because, according to Defendants, he "does not allege sufficient facts to show an ongoing First Amendment violation necessitating injunctive relief." Defs.' Mem. 12. The Defendants assert three arguments for this conclusion: section 147.091, subdivision 1(g) of the Medical Practice Act ("MPA") is neither (1) facially unconstitutional, Defs.' Mem. 12-13, nor (2) unconstitutional as applied to Plaintiff, Defs.' Mem. 13-14, and (3) Plaintiff does not allege facts showing that any First Amendment violation is ongoing, Defs.' Mem. 14.

"[A] suit against a state official may go forward in the limited circumstances identified by the Supreme Court in *Ex Parte Young*." *281 Care Comm.*, 638 F.3d at 632. Those circumstances are met when a plaintiff's "'complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Id.* (quoting *Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland,* 535 U.S. 635, 645 (2002)).

Here, Plaintiff's claim for declaratory and injunctive relief is properly characterized as prospective. *See* Compl. ¶315; *Bennie v. Munn*, 822 F.3d 392, 397 (8th Cir. 2016).

Further, as shown below, Plaintiff has pleaded a violation of his First Amendment rights that is ongoing.

**1. Even were the Court to grant Defendants' motion to dismiss, Plaintiff's case survives the motion because the Defendants do not address all the grounds Plaintiff's claim for injunctive relief.**

Plaintiff has requested an injunction against Defendants' application of their investigatory power against Plaintiff's protected speech. Compl. ¶315. In their defense, Defendants only address the constitutionality (facial and as applied) of section 147.091, subdivision 1(g) of the MPA. But Plaintiff's claim for injunctive relief does not solely rely upon subdivision 1(g) of the MPA. While Plaintiff does plead that subdivision 1(g) is unconstitutional both facially and as applied to him, Plaintiff pleads that his injuries were also a result of the Defendants unconstitutionally applying subdivision 1(k) to his protected speech. *See* Compl. ¶¶115, 203, 262, 267, 279, 286. Nowhere in their memorandum do Defendants argue that subdivision 1(k) was constitutionally applied to Plaintiff.

**2. The Defendants' violation of Plaintiff's First Amendment rights is ongoing.**

Plaintiff requests the Court to enjoin the Defendants from "any future investigations into Plaintiff's protected First Amendment speech." Compl. ¶57. Defendants argue that even if Plaintiff has pleaded a viable claim of Minn. Stat. § 147.091, subd. 1(g)'s unconstitutionality, he nonetheless "does not allege facts that any such violation is ongoing" because "[a]ll complaints received by the Board about Plaintiff, including those that had previously been dismissed and reopened, were dismissed in their entirety on March

24, 2023." Defs.' Mem. 14. In other words, Defendants argue that they have voluntarily ceased their violative conduct.

Defendants' voluntary cessation—without even any acknowledgement of past wrongdoing or promise to desist in the future—carries little water to extinguish Plaintiff's ongoing harm. Defendants' past actions demonstrate a plausible likelihood that "'there is a threat of future enforcement that may be remedied by prospective relief,'" which satisfies the requirement of "an ongoing and continuous violation of federal law." *Bennie*, 822 F.3d at 397 (quoting *Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1338 (11th Cir. 1999)).

Here, the Defendants' dismissal of the complaints against Plaintiff does not moot the issue because they retain the power to reopen the investigations (which, as Plaintiff pleads, they did once before), as well as initiate new investigations into the same protected speech, and they defend their past investigations as constitutional, with no indication that they will alter their conduct with regard to future allegations outside their constitutional jurisdiction. *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719 (2007); *West Virginia v. EPA*, 142 S. Ct. 2587, 2607 (2022).

Therefore, because the Defendants have shown themselves willing to open and reopen investigations into clearly protected speech, Plaintiff plausibly alleges an ongoing risk of harm. S*ee League of Women Voters of Minn. Educ. Fund v. Simon,* No. 20-cv-1205 (ECT/TNL), 2021 U.S. Dist. LEXIS 59526, at *17 (D. Minn. Mar. 29, 2021) ("Allegations of future injury need not lack uncertainty to be plausible. The law is better understood to require only that Plaintiffs allege facts plausibly showing a certainly impending or substantial risk of harm"). Moreover, as mentioned above, anyone can file a complaint,

which, Defendants assert, they are "statutorily required" to pursue. Defs.' Mem. 13. This adds weight to the substantial risk of a future investigation into Plaintiff's protected speech because, as his allegation of continuing harm suggests, Plaintiff continues to voice his political opinions on matters which motivated the complaints of the past complainants. *See* Compl. ¶ 315; *281 CARE Committee*, 638 F.3d at 630.

Therefore, the Court should deny Defendants' motion to dismiss.

**B. The Eleventh Amendment does not Bar Any of Plaintiff's Claims Against the Board and Its Members Acting in Their Official Capacities.**

Plaintiff concedes that current precedent directs this Court to dismiss Plaintiff's claims against the Board and retroactive claims against its members acting in their official capacity. However, Plaintiff believes that that precedent should be reexamined and overruled. Section 1983 does abrogate states' sovereign immunity and does allow damages actions against a state and its officials in federal court. Plaintiff briefly explains to preserve the issue for appeal.

Congress has the power to abrogate a state's sovereign immunity. *Fitzpatrick v. Bitzer*, 427 U.S. 445, 456 (1976). While the Supreme Court has presumed against abrogation of sovereign immunity, that presumption is atextual, ahistorical, and antidemocratic. *See* Katherine Mims Crocker, *Reconsidering Section 1983's Nonabrogation of Sovereign Immunity*, 73 Florida Law Review 523, 529 (2021). If any presumption should be held, it should be that Section 1983 did abrogate the states' sovereign immunity because Congress enacted it pursuant to the Fourteenth Amendment, whose prohibitions "'are directed to the States.'" *Quern*, 440 U.S. at 355 (Brennan &

Marshall, J.J., concurring in the judgment) (quoting *Ex parte Va.*, 100 U.S. at 346-347).

Also, *Ex parte Young* permitts injunctive relief against a state official, which effectively

enjoins the State. *See Ex parte Young*, 209 U.S. at 157. Practically, this is an abrogation of

the states' sovereign immunity effected not by legislative intent or the states' consent but

by judicial decree. The partial abrogation decided by *Ex parte Young* was then recognized

under Section 1983, *see Edelman*, 415 U.S. at 664, which necessarily acknowledges that

Section 1983 does contemplate relief enforceable against the states.

Moreover, if Congress did intend Section 1983 to abrogate the states' immunity,

there is nothing in the text of that law to draw the distinctions that the Supreme Court has

made between individual and official capacity and its preference for prospective over

retroactive relief. To pretend that an injunction is not against an unconsenting State is just

as much a fiction as to pretend a state official's liability for an individual-capacity suit is

not in most cases indemnified by the State itself. *See Edelman*, 415 U.S. at 665 ("It is not

pretended that these payments are to come from the personal resources of these

appellants."). The most logical and consistent interpretation of Section 1983 is that it

abrogated the states' immunity entirely.

Therefore, the Supreme Court should reconsider *Edelman*, *Quern*, *Pennhurst*, *Will*,

and their progeny to find states suable under Section 1983 for retroactive damages.

Finally, the Court's holding in *Will*, following *Quern v. Jordan*, 440 U.S. 332

(1979)*,* that "a State is not a 'person' within the meaning of § 1983," 491 U.S. at 65, is not

supported by the statutory and historical evidence. As Justice Brennan noted in his

concurrence in the judgment in *Quern*, in the Dictionary Act of 1871, enacted "less than

44

two months before the enactment of the Civil Rights Act, Congress provided that 'in all acts hereafter passed…the word "person" may extend and be applied to bodies politic and corporate…unless the context shows that such words were intended to be used in a more limited sense.'" *Quern*, 440 U.S. at 356 (Brennan & Marshall, J.J., concurring in the judgment); *see also id*. n. 11 (noting that "*Monell v. New York City Dept. of Social Services*, 436 U.S. 658 (1978), held that the word 'may' in the Act was to be interpreted as the equivalent of 'shall'"). Citing a litany of cases, Justice Brennan showed that "in 1871 the phrase "bodies politic and corporate" would certainly have referred to the States." *Id*. at 356-57.

Therefore, the Supreme Court should revisit its interpretation of "person" in Section 1983 to hold that person does include a State.

## CONCLUSION

By assigning itself jurisdiction over Dr. Jensen's protected speech over three years in the middle of his campaign for Governor, the Defendant Board and its individual members effectively assumed control of the political narrative he was permitted to espouse without facing *de facto* threats to his livelihood. In doing so, the Defendants chilled the speech of Dr. Jensen and countless other physicians across the state. This silenced many of the very people we should have been listening to during the pandemic – doctors who treated COVID-19 patients – causing the government's preferred narrative to be the only game in town.

The bottom line is that Dr. Jensen was forced by the Board of Medical Practice to choose between remaining silent and risking the loss of votes from scores of Minnesotans who agreed with his message; and exercising his right to speak, thus risking further action by the Board against his license to practice medicine. The First Amendment was adopted to prevent exactly this scenario. Defendants' Motion to Dismiss must be denied, and the Defendants should face trial to account for their unconstitutional acts.

Respectfully submitted,

**JOSEPH LAW OFFICE PLLC**

Dated: August 11, 2023

*/s/ Gregory J Joseph*
Gregory J Joseph (#0346779)
300 E Frontage Road
Waconia, MN 55387
josephlawoffice@protonmail.com
(612) 968-1397

**UPPER MIDWEST LAW CENTER**

Douglas P. Seaton (#127759)
James V. F. Dickey (#393613)
8421 Wayzata Blvd., Suite 300
Golden Valley, Minnesota 55426
James.Dickey@umlc.org
(612) 428-7000

*Attorneys for Plaintiff*