# United States Court of Appeals
## For the Eighth Circuit

---

No. 25-1812

---

Dr. Scott Jensen

*Plaintiff - Appellant*

v.

Minnesota Board of Medical Practice; Ruth Martinez, in both their individual and official capacities as members of the Minnesota Board of Medical Practice; Elizabeth A. Huntley; Cheryl L. Bailey, in both their individual and official capacities as members of the Minnesota Board of Medical Practice; John M. Manahan; Peter J. Henry; Brian Anderson, in his individual and official capacity as a medical regulations analyst for the Minnesota Board of Medical Practice; Jane Roes, 1-12 in both their individual and official capacities as members of the Minnesota Board of Medical Practice; John Does, 1-4 in both their individual and official capacities as members of the Minnesota Board of Medical Practice

*Defendants - Appellees*

---

Appeal from United States District Court
for the District of Minnesota

---

Submitted: February 11, 2026
Filed: September 15, 2026

---

Before LOKEN, L.R. SMITH, and STRAS, Circuit Judges.

---

STRAS, Circuit Judge.

Years of investigations by the Minnesota Board of Medical Practice caused Dr. Scott Jensen to speak less and spend more. Either would be enough for a court to hear his case, so we reverse.

I.

Like the rest of the country, the COVID-19 pandemic divided Minnesotans. Some public officials, including Governor Tim Walz, pushed for aggressive measures to "stop the spread" of the virus. Others like Dr. Scott Jensen, then a state senator, had a different view. He opposed vaccine mandates and believed it was a mistake to close businesses and schools. He ran on that message as the Republican nominee for governor in the 2022 election.

Not everyone liked what he had to say. So much so that, from the pandemic's start until mid-2022, the Minnesota Board of Medical Practice received 18 complaints about him. *See* Minn. Stat. § 214.103, subd. 2 (laying out the "investigat[ory]" process for "[h]ealth-related licensing boards"). The objection was almost always the same: Dr. Jensen was "spreading misinformation" and posed a "danger to public health."

In these situations, the Board has broad investigative powers, starting with a "review" of whether the complaints "allege[] or impl[y] a violation of a statute or rule which [it] is empowered to enforce." *Id.* Three options exist for any that do: "authorize a field investigation," refer the matter to the Attorney General, or try to "resolve" the complaint itself. *Id.* § 214.103, subds. 2, 5, 6. From there, a range of disciplinary measures are available, up to and including "revok[ing]" a physician's license. *Id.* § 147.141; *see id.* § 147.02, subd. 5.

Here, the 18 complaints led to four investigations. At the start of each one, the Board sent him a letter detailing the allegations. Two asked him to "respond[]

in writing[]" and reminded him that, "as a licensee of the Board," he was "required to cooperate fully." *See id.* § 147.131 (requiring doctors to "respond[] fully and promptly to any question" asked by the Board). When he replied to those, he provided the Board with hundreds of pages of information, including news stories about the pandemic, medical studies, and patient records.

One, which lasted more than a year, took on a life of its own. Like the others, it began with a letter informing him that the Board was investigating an allegation that he had "politiciz[ed] public health." *See id.* § 147.091, subd. 1(g)(2) (prohibiting conduct "likely to harm the public"). He cooperated, but the Board waited until after the election to request an "in-person conference." The notice listed multiple possible violations, including "unethical or improper conduct" and "depart[ing] from or fail[ing] to conform to the minimal standards of acceptable and prevailing medical practice." *Id.* § 147.091, subd. 1(g), (k), (o), (s). The subject line underscored the high stakes involved: "In the Matter of the Medical License of Scott M. Jensen, M.D." He hired a lawyer and spent countless hours preparing. After the conference ended, so did the investigation.

Dr. Jensen is concerned that continuing to share his political views will only invite further investigations. His amended complaint alleges multiple constitutional claims, each seeking an injunction preventing future interference with his "speech on matters of public concern made outside . . . the doctor-patient relationship" and damages to compensate him for the harm he has already suffered. The district court granted the Board's motion to dismiss for lack of standing. We start there. *See City of Clarkson Valley v. Mineta*, 495 F.3d 567, 569 (8th Cir. 2007) (calling standing a "threshold inquiry that eschews evaluation on the merits" (citation omitted)).

## II.

Grounded in the case-or-controversy requirement of Article III, *see Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016), standing ensures that the person suing—here, Dr. Jensen—has the "personal stake" necessary for a federal court to intervene,

*Gill v. Whitford*, 585 U.S. 48, 54 (2018). Satisfying it requires "(1) an injury in fact; (2) a causal connection between the injury and the challenged [action]; and (3) a likelihood of redressability." *Hershey v. Jasinski*, 86 F.4th 1224, 1229 (8th Cir. 2023). Plaintiffs "must demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).

In applying these requirements, the district court set the bar too high. At the motion-to-dismiss stage, "we [must] assume the allegations in the complaint are true and view them in the light most favorable to [Dr. Jensen]." *Telescope Media Grp. v. Lucero*, 936 F.3d 740, 749 (8th Cir. 2019). Even "general factual allegations of injury resulting from the defendant's conduct" are enough because "we presum[e] that [they] embrace those specific facts that are necessary to support the claim." *Bennett v. Spear*, 520 U.S. 154, 168 (1997) (first alteration in original) (citation omitted); *see, e.g.*, *Huizenga v. Indep. Sch. Dist. No. 11*, 44 F.4th 806, 811–12 (8th Cir. 2022) (per curiam); *Jones v. Jegley*, 947 F.3d 1100, 1103–04 (8th Cir. 2020). They can—and often do—lead to plausible inferences that satisfy all three standing requirements. *See Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 924 (11th Cir. 2020) (en banc) (differentiating between "general factual allegations," which "can suffice," and "conclusory statements," which "do not"); *see also Rydholm v. Equifax Info. Servs. LLC*, 44 F.4th 1105, 1108 (8th Cir. 2022) ("At the pleadings stage, general factual allegations suffice to support standing."); *Wieland v. U.S. Dep't of Health & Hum. Servs.*, 793 F.3d 949, 954 (8th Cir. 2015) (reaching the same conclusion).

We have little doubt that Dr. Jensen's complaint clears these hurdles when it comes to causation and redressability. At a minimum, the alleged "ever-present threat of further investigation," backed by a list of past investigations, adequately connects his chilled speech and time and money spent responding to what the Board *did*. Money damages would redress those injuries. *See Heights Apartments, LLC v. Walz*, 30 F.4th 720, 726 (8th Cir. 2022) (explaining that damages "redress" a "completed violation of a legal right" (citation omitted)). And to the extent these

past investigations affect his present and future willingness to speak, an injunction would remedy it. *See Rodgers v. Bryant*, 942 F.3d 451, 455 (8th Cir. 2019) (concluding that an "injunction prohibiting" enforcement would redress a chilling injury). Indeed, when it comes to causation and redressability, the Board hardly puts up a fight.

The real battle is over whether Dr. Jensen alleged a sufficiently "concrete and particularized" injury. *Spokeo*, 578 U.S. at 334 (emphasis and citation omitted). The district court said no because the allegations in the complaint were "too conclusory" without "a *specific* instance of speech deterred []or facts suggesting an imminent threat of enforcement." (Emphasis added). It made a mistake in demanding too much.

A.

Dr. Jensen's past injuries fall into two categories. The first is the time and money he spent preparing responses, hiring counsel, and assembling the paperwork. *See TransUnion*, 594 U.S. at 425 (classifying "monetary harms" as concrete injuries). The second was "self-censor[ship]" during the run-up to the 2022 election. *Dakotans for Health v. Noem*, 52 F.4th 381, 386 (8th Cir. 2022). The question is whether these injuries support his claim for damages. *See generally Garcia v. City of Trenton*, 348 F.3d 726 (8th Cir. 2003) (upholding a jury verdict for damages based on a chilling claim).

1.

A "pocketbook" harm is a "classic" Article III injury. *See Tyler v. Hennepin County*, 598 U.S. 631, 636 (2023). In general, monetary harm is an injury precisely because it is both concrete and particularized. Concreteness comes from the fact that it is "real" and "actually exist[s]." *Spokeo*, 578 U.S. at 340; *see TransUnion*, 594 U.S. at 425 (explaining that, as a "tangible" injury, "monetary harm[]" is "obvious[ly]" concrete). And it is "particularized" because it affected Dr. Jensen "in

a personal and individual way." *Spokeo*, 578 U.S. at 339 (citation omitted). Once the Board opened the investigations, *he* had an obligation to "cooperate fully," including "fully and promptly" answering any questions and "providing copies of patient medical records." Minn. Stat. § 147.131.

Even a minor expenditure of "time and resources" counts as an injury. *Brakebill v. Jaeger*, 932 F.3d 671, 677 (8th Cir. 2019). Here, according to the amended complaint, Dr. Jensen did more, far more. For the first few investigations, he was "forced to spend hours of his time" responding. But for the last one, which went on for more than a year, he spent countless hours working on his responses, including compiling documents and eventually hiring a lawyer. These steps, arising out of his obligation to "cooperate fully," Minn. Stat. § 147.131, led to out-of-pocket expenses and resulted in "lost revenue because he took on fewer patients." *See Bost v. Illinois Board of Elections*, 607 U.S. 71, 82 (2026) (requiring the costs to come from "mitigat[ing] or avoid[ing] a substantial risk of some independent harm" (citation omitted)). Regardless of whether the Board thinks Dr. Jensen *should* have taken those actions, they are "classic pocketbook injur[ies]."[1] *Tyler*, 598 U.S. at 636; *see Demarais v. Gurstel Chargo, P.A.*, 869 F.3d 685, 693 (8th Cir. 2017) (explaining that losing "even a small amount of money is ordinarily an 'injury'" (quoting *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464 (2017))).

2.

According to the amended complaint, the investigations also caused Dr. Jensen to change his "message to . . . constituents" and "decline invitations to public[-]speaking events." These general allegations are enough to create a plausible

[1]The "pocketbook injury" supports his claim for damages under both the First and Fourteenth Amendments. Arguably so does the time he lost "communicating with voters on the campaign trail" during the 2022 election. *Cf. Bost*, 607 U.S. at 78–79 (2026) (discussing the harms to a candidate for public office). But given the other particularized and concrete injuries he suffered, there is no need to decide whether the harm to his campaign adds another.

inference that his speech was chilled, something he allegedly told the Board in 2020, shortly after the first investigation began. As we have explained, "one type of injury that confers Article III standing" in First Amendment cases is "when a plaintiff is chilled from exercising h[is] right to free expression." *Henderson v. Springfield R-12 Sch. Dist.*, 163 F.4th 478, 492 (8th Cir. 2025) (en banc) (citation omitted). It happens when a "government official's conduct would cause a person of ordinary firmness to self-censor." *Id.* (citation omitted). Exactly the situation we have here.

In dismissing the case, the district court wanted "specifics," including the "speaking engagements he declined," the "the topics he avoided," and the "instances whe[n] he pulled back." It once again set the bar too high. In addition to general allegations that he changed his message and declined multiple invitations, the amended complaint mentioned that he "took great care to make certain that people understood when he was speaking as a candidate and when he was speaking as a family doctor," something none of his opponents had to do. *See Rodgers*, 942 F.3d at 453–55 (concluding an injury occurred when beggars changed "when, where, and how they beg[ged]" because of the possibility of prosecution); *see also Moms for Liberty v. Brevard Pub. Sch.*, 118 F.4th 1324, 1330–31 (11th Cir. 2024) (determining chilling existed when parents were "very selective" in their speech at school-board meetings). In the face of professional sanctions, Dr. Jensen believed the risk of speaking "candidly and honestly" about "COVID-19 vaccines and other government interventions in personal-health care decisions" presented too great a risk.

A reasonable person in his position would have reacted the same way. *See 281 Care Comm. v. Arneson*, 638 F.3d 621, 627–28 (8th Cir. 2011) (requiring the chill to be "objectively reasonable"). After a steady stream of letters from the Board, anyone in Dr. Jensen's shoes would have been concerned about a looming and "credible threat of enforcement." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014); *see Henderson*, 163 F.4th at 493 (treating threats of "adverse consequences" as an "objectively reasonable basis for self-censoring"); *see also 281 Care Comm.*, 638 F.3d at 630 (explaining that a fear of prosecution was "reasonable" when a plaintiff's past speech had "triggered threats and the filing of one

complaint"). In fact, it would have been unreasonable to ignore the threat given the consequences, which included the potential loss of his medical license. *See Henderson*, 163 F.4th at 492 (holding that threats of being "asked to leave [mandatory] training," not "receiv[ing] credit" for it, and losing pay were reasonably chilling).

It makes no difference that Dr. Jensen "tailored his message" rather than abandoned it. *See Dakotans for Health*, 52 F.4th at 387 (determining there was standing when a law "limit[ed]" but did not eliminate a group's ability to share its political message); *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005) (explaining that the test is whether speech was "chill[ed]," not silenced). After all, changing the "when, where, and how" of speech is an injury. *Rodgers*, 942 F.3d at 455 (holding that, when it happens, the "chilling effect . . . create[s] standing" (citation omitted)). A chilling effect may not be as tangible as a pocketbook injury, but it is still a "concrete and particularized" harm. *TransUnion*, 594 U.S. at 423; *see id.* at 425 (pointing to the abridgment of free speech as a type of "intangible harm" that is "concrete"); *see also Henderson*, 163 F.4th at 492–94 (discussing how a chilling effect can create standing).

B.

The chilling effect he continues to experience also qualifies as an "ongoing" injury supporting injunctive relief. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 415 (2013); *see Frost v. Sioux City, Iowa*, 920 F.3d 1158, 1162 (8th Cir. 2019) (requiring an "ongoing" or "immediate threat of injury" to establish standing for "declaratory and injunctive relief" (quoting *Dearth v. Holder*, 641 F.3d 499, 501 (D.C. Cir. 2011)). Again a candidate for public office, Dr. Jensen continues to be "active in the media" and interact with "members of the public" with the goal of educating them about how current officeholders mismanaged the pandemic.[2] In

[2]As before, general factual allegations are enough to "plausibl[y]" make this claim. *Rydholm*, 44 F.4th at 1108 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *see Jones*, 947 F.3d at 1103–04 (noting that general allegations suffice to

other words, he is in the same position as before, seeking to engage in "substantially similar activity" without having to worry about potentially losing his medical license. *Susan B. Anthony List*, 573 U.S. at 161 (citation omitted); *see Missourians for Fiscal Accountability v. Klahr*, 830 F.3d 789, 794 (8th Cir. 2016) (explaining how a "credible threat of future" enforcement can create an "ongoing [chilling] injury" (quoting *Ward v. Utah*, 321 F.3d 1263, 1267 (10th Cir. 2003))).

It is hard to imagine a situation in which the "threat of future enforcement" could be more credible. *Susan B. Anthony List*, at 164. After 18 complaints and four investigations, pretty "good evidence" of "past enforcement against the same conduct," the threat against Dr. Jensen is far from "chimerical." *Susan B. Anthony List*, 573 U.S. at 164 (citation omitted); *see Chiles v. Salazar*, 146 S. Ct. 1010, 1019 n.* (2026) (concluding there was standing when the state had "fought" the "suit through three courts" and "expressly declined to disavow enforcement"). And the fact that anyone can file a complaint turns him into an "easy target[]" for "political opponents." *Susan B. Anthony List*, 573 U.S. at 164. An appropriately tailored injunction focused on removing the threat would, if issued, redress the continuing chill he faces. *See TransUnion*, 594 U.S. at 435. At least he has standing to try.[3]

III.

Finally, the merits. Both sides want us to decide them, even though the bulk of the briefs focused on standing. Although we suspect that some of our analysis

---

support standing at the pleading stage); *In re SuperValu, Inc.*, 870 F.3d 763, 773 (8th Cir. 2017) (same). Dr. Jensen does not need to name specific times and places.

[3]The same goes for his facial-overbreadth claim. To the extent our cases require an allegation "that third parties will be affected in [a] manner differently from" the plaintiff, the amended complaint discusses another physician whom the Board investigated for pandemic-related speech. *See Josephine Havlak Photographer, Inc. v. Village of Twin Oaks*, 864 F.3d 905, 912 (8th Cir. 2017); *Willson v. City of Bel-Nor*, 924 F.3d 995, 1002 (8th Cir. 2019) (discussing other potential applications).

will be helpful on remand, our usual approach in these circumstances is to let the district court have the first crack at them. *See Tovar v. Essentia Health*, 857 F.3d 771, 779 (8th Cir. 2017). This case is no exception.

IV.

We accordingly reverse the judgment of the district court and remand for further proceedings.

______________________________